# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| **In re General Growth Properties, Inc.** | ) | |
| **ERISA Litigation,** | ) | |
| | ) | **Master File No. 08-cv-6680** |
| | ) | |
| | ) | **Judge Zagel** |
| | ) | |
| **This Document Relates To:** | ) | **Magistrate Judge Denlow** |
| | ) | |
| **All Actions** | ) | |
| | ) | |

## CERTAIN DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Defendants John Bucksbaum, Judy Herbst, Charles Lhotka, Heather Margulis, Michelle McGovern, Robert Michaels, Jean Schlemmer and Kate Sheehy (collectively the "Defendants"),[1] by and through their attorneys, Jenner & Block LLP, submit the following Answer and raise the following Affirmative Defenses to Plaintiffs' Consolidated Class Action Complaint For Violations of the Employee Retirement Income Security Act.

1.       Plaintiffs bring this action on behalf of the Plan and all participants and beneficiaries in the Plan (the "Participants") to recover losses to the Plan for which the fiduciaries of the Plan are liable pursuant to Sections 409 and 502(a)(2) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109 and 1132(a)(2). In addition, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, equitable tracing, and other monetary relief.

Answer to No. 1:   Defendants admit that Plaintiffs seek to bring this action on behalf of the General Growth 401(k) Savings Plan ("the Plan") and all participants and beneficiaries in the Plan to recover alleged losses and for other equitable relief under various provisions of the

---

[1] Defendant Freibaum is represented separately.

Employee Retirement Income Security Act of 1974 ("ERISA").  Except as expressly admitted

herein, the allegations contained in this paragraph are denied.

2.      From April 30, 2007 to April 16, 2009 (the "Class Period"), the Plan acquired and held shares of General Growth common stock ("GGP Stock" or "Company Stock"), which were offered as one of the retirement saving options to Participants in the Plan.

**ANSWER TO NO. 2:**    Defendants admit that one of the investment options offered in

the Plan was a fund consisting of General Growth Properties, Inc. ("GGP") common stock ("the

GGP Stock Fund").  Defendants further admit that Plaintiffs have defined the putative class

period as April 30, 2007 to April 16, 2009.  Except as expressly admitted herein, the allegations

contained in this paragraph are denied.

3.      Throughout the Class Period, Defendants allowed the Plan to acquire and hold GGP Stock even though, by virtue of their senior positions, they knew or should have known that Company Stock was an imprudent means of saving for retirement because, among other things, the Company was exposed to catastrophic losses because it was highly indebted and the credit market collapse made it very difficult to borrow money on favorable terms.

**ANSWER TO NO. 3:**    Defendants deny the allegations contained in this paragraph.

4.      Defendants, each having certain responsibilities regarding the management and investment of the Plan's assets, breached their fiduciary duties to the Plan and its Participants by failing to prudently and loyally manage the Plan's investment in Company Stock by, among other things: (i) continuing to offer Company Stock as a retirement saving option; (ii) continuing to acquire and hold shares of Company Stock in the Plan when it was imprudent to do so; (iii) failing to provide complete and accurate information to Participants regarding the Company's financial condition and the prudence of investing in Company Stock; and (iv) maintaining the Plan's pre-existing investment in Company Stock when it was no longer a prudent investment for the Plan.

**ANSWER TO NO. 4:**    Defendants deny the allegations contained in this paragraph.

5.      As a result of Defendants' fiduciary breaches, as alleged herein, the Plan suffered substantial losses, resulting in the depletion of millions of dollars of the retirement savings and anticipated retirement income of the Plan's Participants. Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

**ANSWER TO NO. 5:**    Defendants deny the allegations contained in this paragraph.

6.      Because Plaintiffs' claims apply to the Participants as a whole, and because ERISA authorizes Participants such as Plaintiffs to sue for plan-wide relief for breach of fiduciary duty, Plaintiffs bring this action as a class action on behalf of all Participants of the Plan during the Class Period. Plaintiffs also bring this action as Participants seeking plan-wide relief for breach of fiduciary duty on behalf of the Plan.

**ANSWER TO NO. 6:**   Defendants admit that Plaintiffs seek to bring this as a class

action on behalf of all participants in the Plan during the putative class period and that they seek

plan-wide relief.  Except as expressly admitted herein, the allegations contained in this paragraph

are denied.

7.      In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are by necessity upon information and belief. At such time as Plaintiffs have had the opportunity to conduct additional discovery, Plaintiffs will, to the extent necessary and appropriate, amend the Complaint or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

**ANSWER TO NO. 7:**   Defendants admit that Plaintiffs purport to make certain of their

allegations upon information and belief, and that Plaintiffs note they may seek leave to amend

the Consolidated Complaint in the future.  Except as expressly admitted herein, the allegations

contained in this paragraph are denied.

## JURISDICTION AND VENUE

8.      ***Subject Matter Jurisdiction.***  This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the  . . . laws . . . of the United States." 28 U.S.C. § 1331.

**ANSWER TO NO. 8:**   Defendants admit this Court has federal question subject matter

jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(2).  Except as expressly

admitted herein, the allegations contained in this paragraph are denied.

9.      ***Personal Jurisdiction.*** ERISA provides for nationwide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). Defendants are all residents of the United States, and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in the state of Illinois.

**ANSWER TO NO. 9:**   Defendants admit this Court has personal jurisdiction over

Defendants.  Except as expressly admitted herein, the allegations contained in this paragraph are

denied.

10.      ***Venue***. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

**ANSWER TO NO. 10:**   Defendants admit that venue is proper in the Northern District

of Illinois.  Except as expressly admitted herein, the allegations contained in this paragraph are

denied.

## PARTIES

A.      Plaintiffs

11.      ***Plaintiff Jay R. Barnes*** is a resident of Havana, Florida and a former General Growth employee. Mr. Barnes was a Participant in the Plan and held GGP Stock in his Plan account.

**ANSWER TO NO. 11:**   Defendants admit that Plaintiff Jay Barnes is a former GGP

employee, was a participant in the Plan, and invested in the GGP Stock Fund.  Defendants

further admit, upon information and belief, that Mr. Barnes resides in Havana, Florida.

12.      ***Plaintiff Nathan B. Zable*** is a resident of Round Lake, Illinois and a former General Growth employee. Mr. Zable was a Participant in the Plan and held GGP Stock in his Plan account.

**ANSWER TO NO. 12:**   Defendants admit that Plaintiff Nathan Zable is a former GGP

employee, was a participant in the Plan, and invested in the GGP Stock Fund.  Defendants

further admit, upon information and belief, that Mr. Zable resides in Round Lake, Illinois.


13.   ***Plaintiff Dana Kaminske*** is a resident of Conover, North Carolina and a former
General Growth employee. Ms. Kaminske was a Participant in the Plan and held GGP Stock in
her Plan account.

**ANSWER TO NO. 13:**   Defendants admit that Plaintiff Dana Kaminske is a former

GGP employee, was a participant in the Plan, and invested in the GGP Stock Fund.  Defendants

further admit, upon information and belief, that Ms. Kaminske resides in Conover, North

Carolina.


**B.**   **Defendants**

**The Companies**

14.   General Growth is a self-administered and self-managed real estate investment
trust with its headquarters located at 110 N. Wacker Dr., Chicago, Illinois. The Company was
founded in 1986 and began publicly trading in April 1993. During the Class Period, General
Growth's stock was traded under the symbol GGP on the New York Stock Exchange, which is an
efficient market. The Company's Stock now trades on the Pink Sheets under the symbol OTC:
GGWPQ.PK. General Growth filed for bankruptcy protection under Chapter 11 of the United
States Bankruptcy Code on April 16, 2009, and therefore no claims are asserted against it in this
Amended Complaint.

**ANSWER TO NO. 14:**   Defendants admit the allegations of this paragraph, except that

GGP's stock resumed trading on the New York Stock Exchange (NYSE) under the ticker symbol

GGP on March 5, 2010.


15.   General Growth conducts substantially all of its business through its operating
partnership, GGP Limited Partnership ("GGPLP"), in which it holds approximately a 98%
ownership interest. GGPLP is the sponsor and administrator of the Plan. GGPLP also filed for
bankruptcy protection under Chapter 11 of the United States Bankruptcy Code on April 16,
2009, and therefore no claims are asserted against it in this Amended Complaint.

**ANSWER TO NO. 15:**   Defendants admit that GGP conducts substantially all of its business through GGP Limited Partnership ("GGPLP"), that GGP is the sole general partner and owns approximately 82% of GGPLP, that GGPLP is the Plan's Sponsor, and that GGPLP filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code on April 16, 2009. Defendants further admit that Plaintiffs do not assert any claims against GGPLP in their Consolidated Complaint.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

**The Director Defendants**

16.   ***Defendant John Bucksbaum ("Bucksbaum")*** served, at all relevant times, as Chairman of the Board of the Company. Defendant Bucksbaum also served as Chief Executive Officer ("CEO") and a member of the Investment Committee (as defined below) of the Plan until October 26, 2008. During the Class Period, Defendant Bucksbaum was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan's fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

**ANSWER TO NO. 16:**   Defendants admit that during the putative class period, John Bucksbaum served as Chairman of the Board of Directors of GGP, Chief Executive Officer of GGP (until October 2008), and a member of the Investment Committee (until October 2008).  To the extent that the remaining allegations in this paragraph set forth legal conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants state that Mr. Bucksbaum only had the authority and responsibility with respect to the Plan as set forth in the applicable Plan documents and other related materials (*i.e.*, 1/1/06 GGPLP written consent and committee charters), and that the scope of any fiduciary duty is set forth in ERISA and the applicable case law.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

17.     *Defendant Bernard Freibaum ("Freibaum")* served as a director, Executive Vice President, Chief Financial Officer ("CFO"), and a member of the Investment Committee of the Plan until October 2008. During the Class Period, Defendant Freibaum was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan's fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

**ANSWER TO NO. 17:**    Defendants admit that from the start of the putative class period until October 2008, Bernard Freibaum served as a Director of GGP, Executive Vice President and CFO of GGP, and a member of the Investment Committee.  To the extent that the remaining allegations in this paragraph set forth legal conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants state that Mr. Freibaum only had the authority and responsibility with respect to the Plan as set forth in the applicable Plan documents and other related materials (*i.e.*, 1/1/06 GGPLP written consent and committee charters), and that the scope of any fiduciary duty is set forth in ERISA and the applicable case law.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

18.     *Defendant Robert A. Michaels ("Michaels")* has been Chief Operating Officer ("COO") of the Company since 1995 and has served, at all relevant times, as a member of the Investment Committee of the Plan. Defendant Michaels also served as a director and President of the Company until October 2008. Defendant Michaels was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

**ANSWER TO NO. 18:**    Defendants admit that during the putative class period, Robert Michaels served as Chief Operating Officer of GGP, President of GGP (until October 2008), a Director of GGP (until October 2008), and a member of the Investment Committee.  To the extent that the remaining allegations in this paragraph set forth legal conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants state that Mr. Michaels only had the authority and responsibility with respect to the Plan as set forth in the

applicable Plan documents and other related materials (*i.e.*, 1/1/06 GGPLP written consent and

committee charters), and that the scope of any fiduciary duty is set forth in ERISA and the

applicable case law.  Except as expressly admitted herein, the allegations contained in this

paragraph are denied.

19.     Defendants Bucksbaum, Freibaum, and Michaels are herein referred to as the "Director Defendants."

**ANSWER TO NO. 19:**    Defendants admit that in this Consolidated Complaint the

Plaintiffs refer to Defendants Bucksbaum, Freibaum and Michaels as the "Director Defendants."

### The Administrative Committee Defendants

20.     GGPLP established the General Growth 401(k) Savings Plan Administrative Committee (the "Administrative Committee") to fulfill its responsibilities as Plan Administrator. The Plan Administrator has sole authority to determine all questions of fact arising under the Plan including, but not limited to, questions arising because of ambiguities, inconsistencies or omissions, and questions as to the rights and eligibility of employees or participants and their beneficiaries and the value of their benefits under the Plan. *See* General Growth 401(k) Savings Plan Summary Plan Description ("SPD") (a true and correct copy of the SPD is attached hereto as Exhibit A).

**ANSWER TO NO. 20:**    Defendants admit that GGPLP established an Administrative

Committee via a January 1, 2006 Written Consent, which included an Administrative Committee

Charter.  To the extent the remaining allegations in this paragraph set forth legal conclusions, an

answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants

refer to the January 1, 2006 Written Consent, Administrative Committee Charter, and the Plan

Summary Plan Description ("SPD") for their true meaning and effect.  Except as expressly

admitted herein, the allegations contained in this paragraph are denied.

21.     GGPLP administered the Plan along with members of the Administrative
Committee, which was appointed to perform Plan-related fiduciary functions and did so in the course
and scope of their services for GGPLP during the Class Period.

**ANSWER TO NO. 21:**   Defendants admit that GGPLP is the Plan's sponsor and that

GGPLP established an Administrative Committee via a January 1, 2006 Written Consent, which

included an Administrative Committee Charter.  Defendants refer to these materials for their true

meaning and effect.  Except as expressly admitted herein, the allegations contained in this

paragraph are denied.

22.     The Administrative Committee was delegated the following responsibilities:

**Service Provider Relationships**

- Select Plan administration service providers (such as third party administrators, claims administrators, and record keepers) and negotiate the terms which services will be provided.

- Employ agents, attorneys, accountants, actuaries or other persons and allocate or delegate to them such powers, rights and duties as the Committee considers necessary or advisable to properly carry out the administration of the Plan.

- Monitor performance of all parties and entities to whom responsibilities have been assigned.

**Policies and Procedures**

- Establish procedures for adjudicating claims.

- Establish procedures for determining the qualified status of domestic relations orders and medical child support order.

- Establish procedures and regulations to be followed by participants or beneficiaries with respect to enrolling in the Plan and filing applications or making other elections.

- Establish any other rules, regulations or procedures as may be necessary or desirable for the proper and efficient administration of the Plan and as are consistent with the terms of the Plan.

**Government Compliance**

- Comply with all governmental reporting and disclosure requirements.

- Review and file government reports or notices and ensure compliance with ERISA's reporting and disclosure procedures.

- Obtain approval of tax-qualified status of the Plan and related trust agreements.

**Plan Operations**

- Ensure that the Plan is operated according to its terms.

- Prepare and distribute disclosures to participants (e.g., summary annual reports, summary plan descriptions, and summaries of material modification).

- Construe and interpret the Plan, and decide all questions relating to the eligibility, benefits and other rights of employees, participants and beneficiaries under the Plan.

- Make factual findings.

- Request and receive from the Partnership and other participating employers, participant information and other such information as is necessary for the proper administration of the Plan.

- Furnish the Partnership upon request annual reports or other reports with respect to the administration of the Plan.

- Take such action as the Committee deems appropriate to correct errors in plan operation or document compliance.

- Compute the amount of benefits that are payable to any person in accordance with the provisions of the Plan and determine the appropriate person to receive the benefits.

- Authorize the payment of Plan benefits.

- Review and approve payment of claims and administrative expenses.

- Determine which expenses of Plan administration shall be paid from plan assets.

- Maintain appropriate records for each individual entitled to

benefits under the Plan.

- Design and adopt any amendments necessary to keep the
  Plan qualified and such other amendments as the
  Committee deems necessary and desirable.

- Delegate day-to-day tasks to appropriate personnel and
  ensure that such tasks are performed consistent with Plan
  provisions and procedures.

*See* General Growth 401(K) Savings Plan Administrative Committee Charter (the
"Committee Charter") (a true and correct copy of the Committee Charter is
attached hereto as Exhibit B).

**ANSWER TO NO. 22:** Defendants refer to the Administrative Committee Charter,

which sets forth the delegated responsibilities of the Administrative Committee, for its true

meaning and effect.  Except as expressly admitted herein, the allegations contained in this

paragraph are denied.

23.   During the Class Period, the Administrative Committee was comprised of the
following persons:

(a)   ***Defendant Judy Herbst ("Herbst")*** served, at all relevant times, as a
Senior Vice President, Human Capital of the Company and as a member
of the Administrative Committee and the Investment Committee (as
defined below) of the Plan. Defendant Herbst was a fiduciary of the Plan,
within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in
that she exercised discretionary authority with respect to the
management and administration of the Plan and/or management and
disposition of the Plan's assets.

(b)   ***Defendant Charles Lhotka ("Lhotka")*** served, at all relevant times, as
Chief Administrative Officer of the Company and as a member of the
Administrative Committee and the Investment Committee of the Plan.
Defendant Lhotka was a fiduciary of the Plan, within the meaning of
ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised
discretionary authority with respect to the management and administration
of the Plan and/or management and disposition of the Plan's assets.

(c)   ***Defendant Michelle R. McGovern ("McGovern")*** served, at all relevant
times, as Vice President, Human Capital of the Company and a member of
the Investment Committee and Administrative Committee of the Plan.
Defendant McGovern was a fiduciary of the Plan, within the meaning of

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that she exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

(d)     ***Defendant Heather Margulis ("Margulis")*** served, at all relevant times, as Senior Benefits Manager of the Company and as a member of the Administrative Committee and Investment Committee of the Plan. Defendant Margulis was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that she exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

Answer to No. 23:

23(a)     Defendants admit that from the start of the putative class period until March 2009, Judy Herbst served as Senior Vice President, Human Capital, a member of the Administrative Committee, and a member of the Investment Committee.  To the extent that the remaining allegations in this paragraph set forth legal conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants state that Ms. Herbst only had the authority and responsibility with respect to the Plan as set forth in the applicable Plan documents and other related materials (i.e., 1/1/06 GGPLP written consent and committee charters), and that the scope of any fiduciary duty is set forth in ERISA and the applicable case law.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

23(b)     Defendants admit that during the putative class period, Charles Lhotka served as Chief Administrative Officer, a member of the Administrative Committee, and a member of the Investment Committee.  To the extent that the remaining allegations in this paragraph set forth legal conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants state that Mr. Lhotka only had the authority and responsibility with respect to the Plan as set forth in the applicable Plan documents and other related materials (i.e., 1/1/06 GGPLP written consent and committee charters), and that the scope

of any fiduciary duty is set forth in ERISA and the applicable case law.  Except as expressly

admitted herein, the allegations contained in this paragraph are denied.

23(c)   Defendants admit that during the putative class period, Michelle

McGovern served as Vice President, Human Capital and a member of the Administrative

Committee.  Ms. McGovern was not a member of the Investment Committee.  To the extent that

the remaining allegations in this paragraph set forth legal conclusions, an answer is neither

necessary nor appropriate.  To the extent an answer is required, Defendants deny that

Ms. McGovern was a fiduciary with respect to the matters at issue in this litigation.

23(d)   Defendants admit that during the putative class period, Heather Margulis

served as Senior Benefits Manager and a member of the Administrative Committee.

Ms. Margulis was not a member of the Investment Committee.  To the extent that the remaining

allegations in this paragraph set forth legal conclusions, an answer is neither necessary nor

appropriate.  To the extent an answer is required, Defendants deny that Ms. Margulis was a

fiduciary with respect to the matters at issue in this litigation

**The Investment Committee Defendants**

24.     GGPLP administered the Plan along with members of the General Growth
401(k) Savings Plan Investment Committee (the "Investment Committee"), which is appointed
by GGPLP to perform Plan-related fiduciary functions and did so in the course and scope of
their services for the Company during the Class Period.

**ANSWER TO NO. 24:**   Defendants admit that GGPLP was the Plan's sponsor and that

GGPLP established an Investment Committee via a January 1, 2006 Written Consent, which

included an Investment Committee Charter.  Defendants refer to these materials for their true

meaning and effect.  Except as expressly admitted herein, the allegations contained in this

paragraph are denied.

25.     According to the Company's Investment Policy:

> The [Investment] Committee is comprised of representatives from
> the Firm's Executive, Finance, Operations, Human Capital, and
> Asset Management department. These individuals are selected
> because they occupy key provisions and/or possess a strong
> investment background. Current representatives hold the positions
> of:
>
> - Chief Executive Officer;
> - President and Chief Operating Officer;
> - Executive Vice President and Chief Financial Officer;
> - Chief Corporate Development Officer;
> - Chief Administrative Officer;
> - Senior Vice President-Human Capital; and
> - Senior Vice President-Finance.

*See* Investment Policy (a true and correct copy is attached hereto as Exhibit C).

**ANSWER TO NO. 25:**   Defendants refer to the Investment Policy attached as

Exhibit C to the Consolidated Complaint, plus the January 1, 2006 Written Consent and

Investment Committee Charter, for their true meaning and effect.  Except as expressly admitted

herein, the allegations contained in this paragraph are denied.

26.     Further, according to the Investment Policy, the Investment Committee was
charged with the following duties:

> - Establishing, maintaining, and reviewing the Policy;
> - Ensuring compliance with ERISA and any other relevant state and
>   federal laws, regulations and rulings that impact the investment process;
> - Identifying and selecting a blend of well managed investment options for
>   the plans that offer an adequately diversified lineup;
> - Monitoring the investment strategies, performance, and risk
>   characteristics of investment options on a regular basis;
> - Taking appropriate action if objectives are not being met or if the
>   investment strategy employed by any of the funds is no longer appropriate
>   for the investment option;
> - Ensuring that fees paid to service providers and other expenses of the
>   Plan are reasonable; and
> - Identifying and selecting service providers to assist in meeting and
>   maintaining Plan objectives.

*See id.*

**ANSWER TO NO. 26:**   Defendants refer to the Investment Policy attached as

Exhibit C to the Consolidated Complaint, plus the January 1, 2006 Written Consent and

Investment Committee Charter, for their true meaning and effect.  Except as expressly admitted

herein, the allegations contained in this paragraph are denied.

27.    The Investment Committee was empowered to add, remove or change investment managers or options as it felt appropriate.

**ANSWER TO NO. 27:**   Defendants refer to the Investment Committee Charter, which

sets forth the delegated responsibilities of the Investment Committee, for its true meaning and

effect.  Except as expressly admitted herein, the allegations contained in this paragraph are

denied.

28.    The Investment Committee was comprised of the following Company employees:

(a)    *Defendant Bucksbaum* served as a member of the Investment Committee during the Class Period. Defendant Bucksbaum was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

(b)    *Defendant Michaels* has been Chief Operating Officer ("COO") of the Company since 1995 and has served, at all relevant times, as a member of the Investment Committee of the Plan. Defendant Michaels also served as a director and President of the Company until October 2008. Defendant Michaels was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

(c)    *Defendant Lhotka* served as a member of the Investment Committee during the Class Period. Defendant Lhotka was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

(d)     **Defendant Herbst** served as a member of the Investment Committee during the Class Period. Defendant Herbst was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that she exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

(e)     **Defendant Jean Schlemmer ("Schlemmer")** served, at all relevant times, as Chief Corporate Development Officer of the Company and as a member of the Investment Committee of the Plan. Defendant Schlemmer was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that she exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

(f)     **Defendant Freibaum** served as a member of the Investment Committee during the Class Period. Defendant Freibaum was a fiduciary of the Plan, within the meaning of ERISA 3(21)(A), 29 U.S.C. 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

(g)     **Defendant Kate Sheehy ("Sheehy")** served, at all relevant times, as Senior Vice President, Partner and Client Relations of the Company and as a member of the Investment Committee of the Plan. Defendant Sheehy was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that she exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

Answer to No. 28:

28(a)   Defendants admit that from the start of the putative class period until October 2008, John Bucksbaum served as a member of the Investment Committee.  To the extent that the remaining allegations in this paragraph set forth legal conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants state that Mr. Bucksbaum only had the authority and responsibility with respect to the Plan as set forth in the applicable Plan documents and other related materials (i.e., 1/1/06 GGPLP written consent and committee charters), and that the scope of any fiduciary duty is set forth in ERISA and the

applicable case law.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

28(b)   Defendants admit that during the putative class period, Robert Michaels served as Chief Operating Officer of GGP, President of GGP (until October 2008), a Director of GGP (until October 2008), and a member of the Investment Committee.  To the extent that the remaining allegations in this paragraph set forth legal conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants state that Mr. Michaels only had the authority and responsibility with respect to the Plan as set forth in the applicable Plan documents and other related materials (i.e., 1/1/06 GGPLP written consent and committee charters), and that the scope of any fiduciary duty is set forth in ERISA and the applicable case law.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

28(c)   Defendants admit that during the putative class period, Charles Lhotka served as a member of the Investment Committee.  To the extent that the remaining allegations in this paragraph set forth legal conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants state that Mr. Lhotka only had the authority and responsibility with respect to the Plan as set forth in the applicable Plan documents and other related materials (i.e., 1/1/06 GGPLP written consent and committee charters), and that the scope of any fiduciary duty is set forth in ERISA and the applicable case law.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

28(d)   Defendants admit that from the start of the putative class period until March 2009, Judy Herbst served as a member of the Investment Committee.  To the extent that the remaining allegations in this paragraph set forth legal conclusions, an answer is neither

necessary nor appropriate.  To the extent an answer is required, Defendants state that Ms. Herbst

only had the authority and responsibility with respect to the Plan as set forth in the applicable

Plan documents and other related materials (i.e., 1/1/06 GGPLP written consent and committee

charters), and that the scope of any fiduciary duty is set forth in ERISA and the applicable case

law.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

   28(e)   Defendants admit that from the start of the putative class period until

March 2009, Jean Schlemmer served as Chief Corporate Development Officer of GGP and a

member of the Investment Committee.  To the extent that the remaining allegations in this

paragraph set forth legal conclusions, an answer is neither necessary nor appropriate.  To the

extent an answer is required, Defendants state that Ms. Schlemmer only had the authority and

responsibility with respect to the Plan as set forth in the applicable Plan documents and other

related materials (i.e., 1/1/06 GGPLP written consent and committee charters), and that the scope

of any fiduciary duty is set forth in ERISA and the applicable case law.  Except as expressly

admitted herein, the allegations contained in this paragraph are denied.

   28(f)   The allegations in this paragraph are not addressed to Defendants and, as

such, an answer is neither necessary nor appropriate.  To the extent an answer is required,

Defendants admit that from the start of the putative class period until October 2008,

Mr. Freibaum served as a member of the Investment Committee.

   28(g)   Defendants admit that during the putative class period, Kate Sheehy

served as Senior Vice President for Partner & Client Relations and a member of the Investment

Committee.  To the extent that the remaining allegations in this paragraph set forth legal

conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required,

Defendants state that Ms. Sheehy only had the authority and responsibility with respect to the

Plan as set forth in the applicable Plan documents and other related materials (i.e., 1/1/06

GGPLP written consent and committee charters), and that the scope of any fiduciary duty is set

forth in ERISA and the applicable case law.  Except as expressly admitted herein, the allegations

contained in this paragraph are denied.

29.    Defendants Bucksbaum, Michaels, Lhotka, Herbst, Schlemmer, Freibaum, and
Sheehy are hereinafter collectively referred to as the "Investment Committee Defendants."

**ANSWER TO NO. 29:**    Defendants admit that in their Consolidated Complaint the

Plaintiffs refer to Defendants Bucksbaum, Michaels, Lhotka, Herbst, Schlemmer, Freibaum and

Sheehy as the "Investment Committee Defendants."

30.    On June 18, 2008, the Investment Committee discussed the potential restrictions
to common stock.

**ANSWER TO NO. 30:**    Defendants admit that at its June 18, 2008 meeting, the

Investment Committee discussed, among other subjects, potential restrictions to the GGP Stock

Fund.  Except as expressly admitted herein, the allegations contained in this paragraph are

denied.

31.    On September 23, 2008, the Investment Committee discussed the following
regarding the Company's stock:

> Determine if there should be more structure around company
> stock. It was agreed that our plan should adopt the best practice of
> a 20% limit on individual plan holdings of common stock. This
> change would be implemented as of January 09' and there would
> be a stepped approach to roll out. The limit would apply to any
> new participants or any current participant that did not have 20%
> holding on company stock yet. Any participant that had a greater
> than 20% holding would not be required to reduce their plan assets.
> An individual communication would be sent out to any participant
> with holdings greater than 20% promoting the importance of
> diversification. Additional information on how this can be done
> and creation of the communication pieces will be created with
> Vanguard and communicated to the Committee.

**ANSWER TO NO. 31:**   Defendants admit that at its September 23, 2008 meeting, the

Investment Committee discussed and agreed to impose certain restrictions on trading within the

GGP Stock Fund.  Defendants further admit that Plaintiffs have quoted in this paragraph a

portion of the minutes from this meeting, which Defendants refer to for its true meaning and

effect.  Except as expressly admitted herein, the allegations contained in this paragraph are

denied.

## THE PLAN

32.     The Plan, sponsored by GGPLP, is an "employee pension benefit plan," as
defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A). The Plan is a legal entity that can sue
and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary
duty action such as this, the Plan is neither defendant nor plaintiff. Rather, pursuant to ERISA
§ 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the
benefit of the Plan and its Participants and beneficiaries.

**ANSWER TO NO. 32:**   To the extent this paragraph sets forth legal conclusions, an

answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants

admit that GGPLP is the Plan's sponsor.  Defendants also refer to the Plan documents, the

referenced provisions of ERISA and the applicable case law for their true meaning and effect.

Except as expressly admitted herein, the allegations contained in this paragraph are denied.

33.     The assets of an employee benefit plan, such as the Plan here, must be "held in
trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period,
the assets of the Plan were held in trust by Vanguard Fiduciary Trust Company pursuant to a
trust agreement. All contributions made to the Plan constitute a form of deferred compensation.

**ANSWER TO NO. 33:**   Defendants admit that during the putative class period,

Vanguard Fiduciary Trust Company served as trustee for the Plan pursuant to a Trust Agreement,

as amended.  Defendants refer to the Trust Agreement for its true meaning and effect.  Except as

expressly admitted herein, the allegations contained in this paragraph are denied.

34.     Nothing in the Plan limited the ability of the Plan's fiduciaries to divest assets invested in the General Growth Properties, Inc. Stock Fund ("GGP Stock Fund") as prudence dictates.

**ANSWER TO NO. 34:**   Defendants refer to the Plan documents, including the General Growth 401(k) Savings Plan (as Amended and Restated Effective January 1, 2008) (the "Plan Document") attached as Exhibit D to the Consolidated Complaint which provided that the Plan was adopted, among other reasons, to enable employees to "obtain[] an ownership interest in the company," for their true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

A.     **General Growth 401(k) Savings Plan**

35.     The Plan was originally adopted by General Growth Management, Inc. on January 1, 1988 to enable eligible employees to provide for their future security by accumulating funds, sharing in the contributions of their employer, and obtaining an ownership interest in the Company.

**ANSWER TO NO. 35:**   Defendants admit the allegations contained in this paragraph. Further answering, Defendants refer to the full text of the Plan Document (Exhibit D) for its true meaning and effect.

36.     On October 1, 1992, the Plan was established as a separate plan as a result of a spin-off of a portion of the General Growth Associates' Savings Plan. Thereafter, on January 1, 1997, the GGP Management, Inc. Savings Plan was merged into this Plan. Then, on June 18, 1998, the General Growth Employee Stock Ownership Plan, a plan intended to invest primarily in employer securities, was merged into this Plan. The Plan was restated on January 1, 2000.

**ANSWER TO NO. 36:**   Defendants admit the allegations contained in this paragraph. Further answering, Defendants refer to the full text of the Plan Document (Exhibit D) for its true meaning and effect.

37.     Prior to January 1, 2006, the Plan was known as the General Growth Management Savings and Employee Stock Ownership Plan. Thereafter, on January 1, 2006, sponsorship of the Plan was transferred from General Growth Management, Inc. to GGP Limited Partnership and the Plan was renamed the General Growth 401(k) Savings Plan.

**ANSWER TO NO. 37:**   Defendants admit the allegations contained in this paragraph.

Further answering, Defendants refer to the full text of the Plan Document (Exhibit D) for its true

meaning and effect.

38.    According to the General Growth 401(k) Savings Plan (as Amended and Restated
Effective January 1, 2008) ("Plan Document") (a true and correct copy of the Plan Document is
attached hereto as Exhibit D)), the Plan was administered by the Company:

> The plan administrator has the discretionary authority to construe
> and interpret the provisions of the plan and make factual
> determinations thereunder, including the power to determine the
> rights or eligibility of employees or participants and any other
> persons, and amounts of their benefits under the plan, and to
> remedy ambiguities, inconsistencies or omissions, and such
> determinations shall be binding on all parties.

**ANSWER TO NO. 38:**   Defendants refer to the full text of the Plan Document

(Exhibit D) for its true meaning and effect.  Except as expressly admitted herein, the allegations

contained in this paragraph are denied.

39.    According to the Plan's Trust Agreement:

> The ***Plan Administrator shall have the exclusive authority and
> discretion to select the investment funds*** ("Investment Funds")
> available for the investment under the Plan.  In making such
> selection, the plan Administrator shall use the care, skill, prudence
> and diligence under the circumstances then prevailing that a
> prudent person acting in a like capacity and familiar with such
> matters would use in the conduct of an enterprise of a like
> character and with like aims.

*See* Trust Agreement, Article II Investment of the Fund, § 2.1 (emphasis added) (a true and
correct copy of the Trust Agreement is attached hereto as Exhibit E).

**ANSWER TO NO. 39:**   Defendants refer to the Plan's Trust Agreement, which is

attached as Exhibit E to the Consolidated Complaint, for its true meaning and effect.  Except as

expressly admitted herein, the allegations contained in this paragraph are denied.

40.     The "Investment Funds" included the GGP Stock Fund.

**ANSWER TO NO. 40:**   Defendants admit that the GGP Stock Fund was one of the

investment options offered within the Plan.  Except as expressly admitted herein, the allegations

contained in this paragraph are denied.


41.     According to the Plan Document:

> Any action required or permitted to be taken by any employer
> under the plan shall be by resolution of its Board of Directors, by
> resolution of a duty authorized committee of its Board of
> Directors, or by a person or persons authorized by the employer's
> charter or by-laws or by resolution of its Board of Directors or
> such committee.

*See* Plan Document, § 11.6.

**ANSWER TO NO. 41:**   Defendants refer to the Plan Document, which is attached as

Exhibit D to the Consolidated Complaint, for its true meaning and effect.  Except as expressly

admitted herein, the allegations contained in this paragraph are denied.


42.     Full-time employees of General Growth were eligible to become a participant in
the Plan beginning on the first day of the first pay period as soon as practicable following their
date of hire. *See* Plan Document § 2.1(a).

**ANSWER TO NO. 42:**   Defendants refer to the Plan Document, which is attached as

Exhibit D to the Consolidated Complaint, for its true meaning and effect.  Except as expressly

admitted herein, the allegations contained in this paragraph are denied.


43.     Participants in the Plan could make "401(k) contributions" by electing to defer
an amount from his or her compensation before federal taxes. *I d .*  § 3.1. A participant could
elect (in increments of one (1) percent to make 401(k) contributions for each Plan year at a rate
of not less than one (1) percent and not greater than fifty (50) percent of the participant's
earnings.

**ANSWER TO NO. 43:**    Defendants refer to the Plan Document, which is attached as

Exhibit D to the Consolidated Complaint, for its true meaning and effect.  Except as expressly

admitted herein, the allegations contained in this paragraph are denied.

44.    Throughout the Class Period, the Plan offered various investment options for
participant contributions, including the GGP Stock Fund. Pursuant to the Company's 2007 Form
11-K, dated June 26, 2008 ("2007 Form 11-K"):

> At December 31, 2007, the Plan offered the following investment
> options: Twenty-two registered investment companies which offer
> investments in stock, bonds and cash-equivalents; Common stock
> of the Company's ultimate parent, General Growth Properties, Inc.
> ("GGPI"), a public-traded real estate investment trust ("Employer
> Stock Fund"); Vanguard Retirement Savings Trust, a collective
> investment that, which invests primarily in investment contracts
> issued by insurance companies, banks or other financial
> institutions; and Vanguard Brokerage Option which offers direct
> investment in registered investment companies, stock, bonds and
> cash-equivalents.

*See* 2007 Form 11-K (a true and correct copy of the 2007 Form 11-K is attached hereto as
Exhibit F).

**ANSWER TO NO. 44:**    Defendants admit that the GGP Stock Fund was one of the

investment options offered by the Plan.  Defendants refer to GGP's 2007 Form 11-K, which is

attached as Exhibit F to the Consolidated Complaint, for its true meaning and effect.  Except as

expressly admitted herein, the allegations contained in this paragraph are denied.

45.    The GGP Stock Fund was comprised of shares of Company Stock and any
amounts allocated to the fund that are not yet invested in Company Stock.

**ANSWER TO NO. 45:**    Defendants admit the allegations contained in this paragraph.

46.    The Plan did not require the fiduciaries to offer GGP Stock as a retirement
savings option. Rather, the Plan Document provided:

> The trust fund shall consist of such investment funds as the
> company shall determine from time to time, ***which may*** include a
> fund investing solely in shares of General Growth Properties, Inc.

> (the "GGP (Stock Fund"). Pending investment, reinvestment or
> distribution, as provided in the plan, the trustee may temporarily
> retain the assets of any one or more of the investment funds in
> cash, commercial paper, short-term obligations, or undivided
> interests or participations in common or collective short-term
> investment funds.

*See* Plan Document § 5.2 (emphasis added).

**ANSWER TO NO. 46:**   Defendants refer to the Plan Document, which is attached as

Exhibit D to the Consolidated Complaint, for its true meaning and effect.  Except as expressly

admitted herein, the allegations contained in this paragraph are denied.


47.     Throughout the Class Period, the Company made Company Matching
Contributions to the Plan. "The Company adds to a participant's account through a matching
contribution up to 5% of the participant's annual earnings contributed to the Plan. The Company
will match 100% of the first 4% of earnings contributed by each participant and 50% of the next
2% of earnings contributed by each participant." *See 2007* Form 11-K.

**ANSWER TO NO. 47:**   Defendants refer to GGP's 2007 Form 11-K, which is attached

as Exhibit F to the Consolidated Complaint, for its true meaning and effect.  Except as expressly

admitted herein, the allegations contained in this paragraph are denied.


48.     Pursuant to the SPD, General Growth's filings with the SEC were expressly
incorporated into the Plan's governing documents and as such, constituted fiduciary
communications to Plan Participants:

> The Securities and Exchange Commission ("SEC") allows General
> Growth Properties, Inc. ("GGP") to disclose important information
> to you by referring you to documents that have been previously
> filed by GGP with the SEC. This is called incorporation by
> reference. The information GGP incorporates by reference is
> considered a part of this prospectus. The filings that are
> incorporated by reference into this prospectus include:
>
> 1.      GGP's latest annual report on Form 10-K and the Plan's
>         latest annual report on Form 11-K filed pursuant to Section
>         13(a) or 15(d) of the Securities Exchange Act of 1934 (the
>         "1934 Act");

2.      All other reports filed by GGP or the Plan under Section 13(a) or 15(d) of the 1934 Act since the end of the fiscal year covered by GGP's annual report to in (1) above;

3.      The description of GGP's common stock which are including any amendment or report filed for the purpose of updating such descriptions; and

4.      Any future filings that GGP or the Plan makes with the SEC under Sections 13(a), 13(c), 14 and 15(d) of the Securities Exchange Act before the termination of this offering.

Answer to No. 48:   Defendants deny the allegations contained in this paragraph.


**B.      The Plan Incurred Significant Losses During The Class Period**

49.     During the Class Period, GGP Stock represented a significant portion of the Plan's assets.

**ANSWER TO NO. 49:**   Defendants admit that during portions of the putative class period, certain participants directed that a portion of their assets be invested in the GGP Stock Fund.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.


50.     According to the Investment Committee Meeting Notes, "GGP stock has the most assets in the plan at $75,567,299 which is 27% of the plan."

**ANSWER TO NO. 50:**   Defendants admit that Plaintiffs are quoting from a portion of the minutes from the June 12, 2007 meeting of the Investment Committee.  Defendants refer to the full text of the minutes for their true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.


51.     As of March 31, 2008, the Plan held approximately $56 million in GGP Stock (17.96% of the Plan).  Further, according to the Investment Committee Notes, the assets in GGP Stock have gone down in the last few years from 39% as of March 2005 and 18.3% as of December 2007.  Moreover, there were 39 participants as of March 31, 2008 who had 100% of their Plan investment in GGP Stock.

**ANSWER TO NO. 51:**   Defendants admit that Plaintiffs are quoting from portions of

the minutes from the June 18, 2008 meeting of the Investment Committee.  Defendants refer to

the full text of the minutes for their true meaning and effect.  Except as expressly admitted

herein, the allegations contained in this paragraph are denied.


52.     The Plan has incurred substantial losses as a result of the Plan's investment in
GGP Stock.

**ANSWER TO NO. 52:**   Defendants deny the allegations contained in this paragraph.


**C.     The Director Defendants' Fiduciary Status**

53.     During the Class Period, the Director Defendants had the power to carry out
their fiduciary responsibilities under the Plan and ERISA.  *See* Plan Document, § 11.6 ("Any
action required or permitted to be taken by any employer under the plan shall be by resolution
of its Board of Directors, by resolution of a duty authorized committee of its Board of Directors,
or by a person or persons authorized by the employer's charter or by-laws or by resolution of its
Board of Directors or such committee").  As a result, the Director Defendants are named and
functional fiduciaries under ERISA.

**Answer to No. 53:**   To the extent the allegations in this paragraph set forth legal

conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required,

Defendants state that the Director Defendants only had the authority and responsibility with

respect to the Plan as set forth in the applicable Plan documents and other related materials (i.e.,

1/1/06 GGPLP written consent and committee charters), and that the scope of any fiduciary duty

is set forth in ERISA and the applicable case law.  Except as expressly admitted herein, the

allegations contained in this paragraph are denied.


54.     Consequently, in light of the foregoing duties, responsibilities, and actions, the
Qualified Committee Defendants were *de facto* fiduciaries of the Plan within the meaning of
ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period because they exercised
discretionary authority or discretionary control over the management of the Plan, exercised
authority or control over the management or disposition of the Plan's assets, and/or had
discretionary authority over or discretionary responsibility for the administration of the Plan.

**ANSWER TO NO. 54:**   Defendants deny the allegations of this paragraph regarding

the "Qualified Committee Defendants" because this term is not defined in the Consolidated

Complaint.

**D.**     **The Administrative Committee's Fiduciary Status**

55.     During the Class Period, the Company also relied on the Administrative
Committee Defendants (Defendants Herbst, Lhotka, McGovern, and Margulis) to carry out their
fiduciary responsibilities under the Plan and ERISA. As a result, the Administrative Committee
Defendants are functional fiduciaries under ERISA.

**ANSWER TO NO. 55:**   To the extent the allegations in this paragraph set forth legal

conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required,

Defendants state that the Administrative Committee Defendants only had the authority and

responsibility with respect to the Plan as set forth in the applicable Plan documents and other

related materials (i.e., 1/1/06 GGPLP written consent and committee charters), and that the scope

of any fiduciary duty is set forth in ERISA and the applicable case law.  Further answering,

Defendants deny that the Administrative Committee Defendants are functional fiduciaries with

respect to the matters at issue in this litigation.  Except as expressly admitted herein, the

allegations contained in this paragraph are denied.

56.     Consequently, in light of the foregoing duties, responsibilities, and actions, the
Administrative Committee Defendants were *de facto* fiduciaries of the Plan within the
meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period because they
exercised discretionary authority or discretionary control over the management of the Plan,
exercised authority or control over the management or disposition of the Plan's assets, and/or
had discretionary authority over or discretionary responsibility for the administration of the
Plan.

**ANSWER TO NO. 56:**   To the extent the allegations in this paragraph set forth legal

conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required,

Defendants state that the Administrative Committee Defendants only had the authority and

responsibility with respect to the Plan as set forth in the applicable Plan documents and other

related materials (i.e., 1/1/06 GGPLP written consent and committee charters), and that the scope

of any fiduciary duty is set forth in ERISA and the applicable case law.  Further answering,

Defendants deny that the Administrative Committee Defendants are functional fiduciaries with

respect to the matters at issue in this litigation.  Except as expressly admitted herein, the

allegations contained in this paragraph are denied.

E.      **The Investment Committee's Fiduciary Status**

57.      During the Class Period, the Company also relied on the Investment Committee
Defendants (Defendants Bucksbaum, Michaels, Lhotka, Herbst, Schlemmer, Freibaum, and
Sheehy) to carry out their fiduciary responsibilities under the Plan and ERISA. As a result, the
Investment Committee Defendants are functional fiduciaries under ERISA.

**ANSWER TO NO. 57:**    To the extent the allegations in this paragraph set forth legal

conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required,

Defendants state that the Investment Committee Defendants only had the authority and

responsibility with respect to the Plan as set forth in the applicable Plan documents and other

related materials (i.e., 1/1/06 GGPLP written consent and committee charters), and that the scope

of any fiduciary duty is set forth in ERISA and the applicable case law.  Except as expressly

admitted herein, the allegations contained in this paragraph are denied.


58.      Consequently, in light of the foregoing duties, responsibilities, and actions, the
Investment Committee Defendants were *de facto* fiduciaries of the Plan within the meaning of
ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period because they exercised
discretionary authority or discretionary control over the management of the Plan, exercised
authority or control over the management or disposition of the Plan's assets, and/or had
discretionary authority over or discretionary responsibility for the administration of the Plan.

**ANSWER TO NO. 58:**    To the extent the allegations in this paragraph set forth legal

conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required,

Defendants state that the Investment Committee Defendants only had the authority and

responsibility with respect to the Plan as set forth in the applicable Plan documents and other

related materials (i.e., 1/1/06 GGPLP written consent and committee charters), and that the scope

of any fiduciary duty is set forth in ERISA and the applicable case law.  Except as expressly

admitted herein, the allegations contained in this paragraph are denied.

## **FACTUAL BASIS OF THE FIDUCIARY BREACHES**

59.     In its 2008 Annual Report, the Company reported that, "(f)rom 2005 to the third
quarter of 2008, our operational focus was on development projects, including new development
and redevelopment and expansion of existing properties." In order to finance its real estate
expansion plan, General Growth secured billions of dollars in mortgage and construction loans.

**ANSWER TO NO. 59:**   Defendants refer to the full text of GGP's 2008 Annual Report

for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in

this paragraph are denied.


60.     However, as a real estate investment trust, General Growth and the other
Defendant fiduciaries either knew or should have known that the nationwide subprime lending
crisis and substantial declines in consumer spending made expansion of real estate holdings an
ill-advised business plan.  Thus, the Company's plan to continue acquiring, developing, and
renovating real estate properties during a time when the real estate market was noticeably
deteriorating was utterly reckless.

**ANSWER TO NO. 60:**   Defendants deny the allegations contained in this paragraph.


61.     Indeed, the Company's expansion plans caused the Company to accumulate
billions of dollars in debt arising out of loans the Company secured in order to finance its real
estate projects. As the economy continued to weaken during the Class Period, the Company
became unable to satisfy or refinance its billions of dollars in debt when those debts began
maturing in 2008 and 2009.

**ANSWER TO NO. 61:**   Defendants admit that GGP had billions of dollars in debt as

was publicly disclosed and that, as the economy continued to weaken and credit markets suffered

significant deterioration, GGP was unable to refinance all of its debts as they came due in late

2008 and 2009.  Except as expressly admitted herein, the allegations contained in this paragraph

are denied.

62.     Compounding the problems caused by its reckless business plan, the Company failed to disclose to the investing public or the Plan's Participants the adverse affect of the real estate market's collapse on the Company's real estate holdings, as well as the Company's inability to satisfy or refinance its substantial debt obligations.

**ANSWER TO NO. 62:**     Defendants deny the allegations contained in this paragraph.

63.     Indeed, throughout the Class Period, the Company and its officers and directors (many of them Plan fiduciaries) repeatedly issued materially inaccurate statements that misrepresented the strength of the Company's business and its ability to refinance hundreds of millions of dollars in mortgages. Such misstatements and omissions by General Growth and its officers and directors misled the public and the Participants regarding the overall health of the Company. As a result, GGP Stock traded at artificially inflated prices throughout the Class Period making continued investment in such stock imprudent for the Plan.

**ANSWER TO NO. 63:**     Defendants deny the allegations contained in this paragraph.

64.     The Class Period begins on April 30, 2007, when the Company reported financial results for the first quarter of 2007. The Company reported that its Core Funds From Operations ("Core FFO") per fully diluted share were $0.65 for the first quarter of 2007 as compared to $0.71 in the comparable period of 2006. Fully diluted Funds From Operations per share ("FFO") were $1.66 for the first quarter of 2007, as compared to $0.77 reported for the previous year. Earnings per share – diluted ("EPS") were $0.94 for the first quarter of 2007 as compared to $0.10 in the first quarter of 2006.

**ANSWER TO NO. 64:**     Defendants admit that the putative class period begins on

April 30, 2007.  Defendants refer to GGP's April 30, 2007 press release "General Growth

Properties, Inc. Releases Results of Operations for First Quarter 2007" for its true meaning and

effect.  Except as expressly admitted herein, the allegations contained in this paragraph are

denied.

65.     On April 30, 2007, Defendant Bucksbaum commented:

Our multi-purpose shopping, dining, socializing and entertainment venues continue to perform well and to attract consumers of all ages. ***Retailer demand for space remains strong and sales productivity Ls climbing.***

(Emphasis added).

      **ANSWER TO NO. 65:**   Defendants refer to GGP's April 30, 2007 press release

"General Growth Properties, Inc. Releases Results of Operations for First Quarter 2007" for its

true meaning and effect.  Except as expressly admitted herein, the allegations contained in this

paragraph are denied.

      66.    On May 1, 2007, the Company held a conference call with analysts and investors
(which included Plan Participants) entitled "Q1 2007 General Growth Properties Inc Earnings
Conference Call." It was at this conference call that Defendant Michaels, President and COO, stated:

> During the first quarter, our retail partners *continued to show strong
> sales and margins.*  And earnings to-date from all base specialty
> retailers look very encouraging.
>
>         *        *        *
>
> As we look to the second, third, and fourth quarters of 2007, we believe
> our occupancies will remain high and that we will end 2007 at or above
> where we finished 2006, at 93.5%. *We believe that the comparative
> store sales will be in the plus 3 to 4% range during 2007 and
> that will drive demand for our space.*  I believe 2007 will be a good
> year both for our retail partners and general growth.

(Emphasis added).

      **ANSWER TO NO. 66:**   Defendants refer to the full text of GGP's May 1, 2007 First

Quarter 2007 Earnings Conference Call for its true meaning and effect.  Except as expressly

admitted herein, the allegations contained in this paragraph are denied.

      67.    On May 9, 2007, the Company reiterated these results in its quarterly report on
Form 10-Q filed with the SEC.

      **ANSWER TO NO. 67:**   Defendants refer to the full text of GGP's Form 10-Q for the

period ending March 31, 2007 for its true meaning and effect.  Except as expressly admitted

herein, the allegations contained in this paragraph are denied.

68.     On July 9, 2007, *Bloomberg News* published an article entitled "U.S. Shopping Center Vacancies Rise to 7.3%, Near 4-Year High." The article described how vacancy rates in neighborhood and community shopping centers in the United States had climbed to 7.3 percent by the second quarter of 2007. The article also quoted Sam Chandan, Chief Economist of Reis, who predicted that "the vacancy rate will rise in the second half [of 2007]"

**ANSWER TO NO. 68:**   Defendants refer to the full text of the July 9, 2007 Bloomberg News article, "U.S. Shopping Center Vacancies Rise to 7.3%, Near 4-Year High" for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

69.     On July 31, 2007, after the market closed, the Company issued a press release announcing its financial results for the second quarter of 2007. The Company reported that Core FFO per fully diluted share were $0.73. Core FFO per fully diluted share for the comparable period in 2006 was $0.62. FFO per fully diluted share were $0.71 for the second quarter of 2007, as compared to $0.62 of FFO per fully diluted share reported in the comparable period of 2006. EPS were $0.03 and a loss of $0.11, respectively, for the second quarters of 2007 and 2006. This press release was filed with the SEC on Form 8-K.

**ANSWER TO NO. 69:**   Defendants refer to the full text of GGP's July 31, 2007 press release "General Growth Properties, Inc. Reports Operating Results for the Second Quarter 2007" (which was filed with the SEC on Form 8-K) for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

70.     On that same date, Defendant Bucksbaum commented on the results as follows:

> Our double-digit Core FFO growth was driven by the excellent operating metrics of our core real estate business. ***I am confident that there is a bright future for our Company.***

(Emphasis added).

**ANSWER TO NO. 70:**   Defendants refer to the full text of GGP's July 31, 2007 press release "General Growth Properties, Inc. Reports Operating Results for the Second Quarter 2007" for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

71.     Despite Defendant Bucksbaum's expression of "confidence," the Company's stock price declined steadily since the Company announced its first quarter results on April 30, 2007. On August 1, 2007, the Company Stock price closed at $47.18 per share, down 26 percent from the $63.85 per share price on April 30, 2007.

**ANSWER TO NO. 71:**   Defendants admit that GGP's stock closed at $63.85 on

April 30, 2007, and at $47.18 on August 1, 2007.  Except as expressly admitted herein, the

allegations contained in this paragraph are denied.

72.     On August 1, 2007, commenting on the Company's results in an earnings call entitled "Q2 2007 General Growth Properties Inc. Earnings Conference Call," Defendant Bucksbaum assured investors that everything was fine with the Company, that he did not understand why the Company Stock price was falling, and warned against betting against consumers. Specifically, he stated as follows:

> During the second quarter, we produced core funds from operations of $0.73 per share versus $0.62 a share in the second quarter of 2006, a 17.7% increase. There is much good news to be derived from our performance and I'm pleased to tell you that our retail business continues to perform at a high level. The bad news is that our stock declined by almost 18% during the quarter and was down an additional 9% for the month of July. ***Something is wrong. We have strong earnings, good operating metrics, and an exciting future full of new developments, redevelopments, international activity, and urban opportunities. Albeit, we need a strong consumer to continue spending, but whenever there has been a bet against the consumer, it has generally been wrong. If one looks at employment, it continues to be strong; more than 95% of the workforce is employed. Disposable personal income continues to grow at an approximate 4% annualized rate and household wealth has consistently increased over the last 35 years with the exception of the period of 1999 through 2002. And even though household wealth declined during that period, sales in GGP shopping malls continued to grow.***
>
> ***There is an obvious disconnect between the stock price and our performance. All of us at General Growth are bullish about our future.*** We are in a long-term growth and value creation business. We continue to create ongoing value at our centers by adding new retailers, redeveloping our centers and adding new real estate components to our land. Our Company has the best properties to accommodate additional retail uses and/or morph into other facets of real estate and that only makes our properties more valuable over time.

> ***The quarter was highlighted by record-setting occupancy of 92.9%,
> a full 170 basis points higher than our previous second-quarter
> record in 2006 of 91.2%, and this positions us well for bettering our
> 2006 year-end occupancy, which was 93.6%. New rents continued
> to increase as the demand for quality mall space remains high.***
> Sales per square foot remained at a record level of $458. Total
> sales increased 4.5% during the trailing 12 months and our
> comparable NOI increased 3.3% in our consolidated properties and
> 5.1% in our unconsolidated properties, which combined, gives us a
> total pro rata NOI comp increase of 3.7%.
>
> Year-to-date, we have completed new and renewal leases involving
> approximately 4.2 million square feet of space. This number is
> approximately 19% higher than the first six months of 2006. We
> have been telling you for sometime about the new concepts being
> brought to market by our retail partners and these new concepts are
> evidenced in our strong operating members. We remain very active
> with both new developments and redevelopment. Our
> redevelopment pipeline has more than 60 projects totaling
> approximately $1 billion and we have 15 new developments under
> construction representing approximately $2.1 billion of new
> investments.
>
> ***International activity continues to grow as we now have three
> projects under construction in Brazil and two centers in Turkey
> under construction. We remain very optimistic about our prospects
> for international growth.*** I'm pleased with the strong operating
> performance of our Company and I expect it to continue.

(Emphasis added).

**ANSWER TO NO. 72:**   Defendants refer to the full text of GGP's August 1, 2007

Second Quarter 2007 Earnings Conference Call for its true meaning and effect.  Except as

expressly admitted herein, the allegations contained in this paragraph are denied.


73.     On August 8, 2007, the Company reiterated the financial results announced in its
quarterly report on Form 10-Q filed with the SEC.

**ANSWER TO NO. 73:**   Defendants refer to the full text of GGP's Form 10-Q for the

period ending June 30, 2007 for its true meaning and effect.  Except as expressly admitted

herein, the allegations contained in this paragraph are denied.

74.     On October 31, 2007, after the market closed, the Company issued a press release announcing its financial results for the third quarter of 2007. The Company reported Core FFO per fully diluted share for the third quarter of 2007 was $0.80 and core FFO per fully diluted share for the comparable period in 2006 was $0.63. Fully diluted FFO per share were $0.83 for the third quarter of 2007, as compared to $0.65 of FFO per fully diluted share reported in the comparable period of 2006. EPS were $0.09 and a loss of $0.03, respectively, for the third quarters of 2007 and 2006. This press release was filed with the SEC on Form 8-K.

**ANSWER TO NO. 74:**   Defendants refer to the full text of GGP's October 31, 2007 press release "General Growth Properties, Inc. Reports Significantly Improved Operating Results for the Third Quarter 2007" (which was filed with the SEC on Form 8-K) for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

75.     On that same date, Defendant Bucksbaum commented on the results as follows:

> *Record levels of occupancy, sales per square foot and total net operating income were achieved this quarter. Well located and effectively leased malls continue to produce robust increases in operation cash flow.*

(Emphasis added).

**ANSWER TO NO. 75:**   Defendants refer to the full text of GGP's October 31, 2007 press release "General Growth Properties, Inc. Reports Significantly Improved Operating Results for the Third Quarter 2007" (which was filed with the SEC on Form 8-K) for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

76.     On November 1, 2007, the Company held a conference call with analysts and investors (which included Plan Participants) entitled "Q3 2007 General Growth Properties Inc Earnings Conference Call." It was at this conference call that Defendant Bucksbaum stated in relevant part:

> The quarter was highlighted by a total portfolio of comparable NOI increase of 5.6%. Other highlights for the quarter included

record-setting occupancy of 93.2%, which is 80 basis points higher than the third quarter record that was previously set in 2006. As I reported in the second quarter, ***we are well positioned to better our 2006 year end occupancy, which was 93.6%, and this follows exactly along the lines of what we discussed back in February at the beginning of the year when looking at 2007.***

(Emphasis added).

**ANSWER TO NO. 76:**   Defendants refer to the full text of GGP's November 1, 2007

Third Quarter 2007 Earnings Conference Call for its true meaning and effect.  Except as

expressly admitted herein, the allegations contained in this paragraph are denied.

77.     On November 9, 2007, the Company reiterated the financial results announced in its quarterly report on Form 10-Q filed with the SEC.

**ANSWER TO NO. 77:**   Defendants refer to the full text of GGP's Form 10-Q for the

period ending September 30, 2007 for its true meaning and effect.  Except as expressly admitted

herein, the allegations contained in this paragraph are denied.

78.     By the end of 2007, the real estate market had substantially declined as the subprime lending crisis worsened. Analysts and others were forecasting continued declines in the real estate market and deepening concerns for the condition of the United States economy.

**ANSWER TO NO. 78:**   Defendants refer to the full text of whatever analyst reports

Plaintiffs are referencing in this paragraph for their true meaning and effect.  Except as expressly

admitted herein, the allegations contained in this paragraph are denied.

79.     Indeed, on November 20, 2007, Stifel, Nicolaus & Company Incorporated ("Stifel"), issued a report entitled "REIT ALL: The Party's Over – REITS Hunker Down – NAREIT Wrap-Up." The report detailed the seven factors that caused Stifel to downgrade the entire sector: (a) declining cap rates on real estate values, (b) tighter underwriting standards, (c) mutual fund outflows, (d) international investment bias, (e) non-dedicated investor flight, (f) low dividend yields, and (g) at-risk consumers due to the housing correction.

**ANSWER TO NO. 79:**   Defendants refer to the full text of the November 20, 2007

Stifel Nicolaus report entitled:  "The Party's Over – REITS Hunker Down – NAREIT Wrap-Up"

for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in

this paragraph are denied.

80.     Despite those warnings, however, on January 7, 2008, the Company announced it had declared a dividend of $0.50 per share, payable on January 31, 2008. The dividend represented an 11 percent increase over the prior year's dividend.

**ANSWER TO NO. 80:**   Defendants refer to the full text of GGP's November 7, 2007

press release "General Growth Properties Declares Quarterly Dividend on Common Stock" for

its true meaning and effect.  Except as expressly admitted herein, the allegations contained in this

paragraph are denied.

81.     On January 9, 2008, the Company issued a press release announcing its "capital roadmap for 2008 and 2009." The press release was purportedly issued to provide investors (which included Plan Participants) and the financial community a better basis for evaluating the Company's ability to refinance upcoming maturing debt. This press release was filed with the SEC on Form 8-K. The press release stated as follows:

> As of the end of 2007, GGP had $2.621 billion of company portfolio debt maturing in 2008 and *$3.344* billion of company portfolio debt maturing in 2009. Of this, $359 million of 2008-2009 maturing debt has already been refinanced.
>
> The debt maturing in 2008 includes $1.816 billion of mortgage and other secured debt, $722 million of remaining bridge acquisition debt, and $83 million of notes. The Company estimates that property-level income, a measure used by lenders for financing purposes, will be approximately $365 million in the twelve months following the maturity date of the debt maturing in 2008. Using an average capitalization rate of 7.5% to determine loan capacity, the

properties would have a value for financing purposes of
$4.867 billion. Accordingly, the maturing 2008 mortgage debt of
$1.816 billion represents approximately 37.3% of the financing
value of the properties.

The debt maturing in 2009 includes $2.744 billion of mortgage and
other secured debt and *$600* million of notes. The Company
estimates that property-level income will be approximately
*$415* million in the twelve months following the maturity date of
the debt maturing in 2009. Using an average capitalization rate of
*7.5%* to determine loan capacity, the properties would have a value
for financing purposes of *$5.533* billion. Accordingly, the maturing
2009 mortgage debt of *$2.744* billion represents approximately
*49.6%* of the financing value of the properties.

We are currently negotiating the terms of the agreements to
refinance debt maturing in *2008.* The terms of these new long term
fixed rate mortgage loans include expected loan amounts equal to
approximately *50%—60%* of property value for financing purposes,
capitalization rates well below *7.5%*, and interest rates of
approximately *5.75%.* **As a result, although agreements to refinance
debt maturing in 2008 and 2009 have not been reached, we currently
believe that over the next two years the Company will generate
significant excess proceeds from the refinancing of the $4.56 billion
of maturing mortgage debt.**

The Company also owns unencumbered income producing and
development in progress properties that the Company believes have
a value for *financing* purposes of at least $2.5 billion. In addition,
the Company has maintained since 2004 that the Company would
sell certain office assets upon expiration of tax-related restrictions in
2008, and the Company is currently offering for sale a number of
suburban office buildings. Further, the Master Planned Community
land is substantially unencumbered.

Future development expenditures, including expenditures for
projects under consideration, are currently expected to total
approximately $1.3 billion in 2008 and $1.0 billion in 2009. Those
expenditures could be reduced, however, as conditions may
warrant.

**To summarize, the Company believes that excess proceeds from
refinancing maturing mortgages, new financing on currently
unencumbered operating assets, new construction loans on future
development projects, proceeds from the sale of office buildings
and cash from operations will, in the aggregate, be more than
sufficient to meet the Company's cash needs in 2008 and 2009.**

(Emphasis added).

**ANSWER TO NO. 81:**    Defendants refer to the full text of GGP's January 8, 2008

press release "General Growth Announces Capital Roadmap for 2008 and 2009" (which was

filed with the SEC on Form 8-K) for its true meaning and effect.  Except as expressly admitted

herein, the allegations contained in this paragraph are denied.

82.    Defendant Bucksbaum also added:

> ***We remain confident that we will have sufficient capital to
> pursue our expansion plans,*** which primarily focus on
> redeveloping existing properties, but also include a few ground
> up developments. As we execute these plans, we will continue to
> weigh these decisions carefully and to operate in the best interests
> of our stockholders.

(Emphasis added).

**ANSWER TO NO. 82:**    Defendants refer to the full text of GGP's January 8, 2008

press release "General Growth Announces Capital Roadmap for 2008 and 2009" for its true

meaning and effect.  Except as expressly admitted herein, the allegations contained in this

paragraph are denied.

83.    On that same date, Defendant Freibaum, CFO of the Company, commented:

> Lender interest in our mall properties continues to be active, and
> ***we have many sources for capital to refinance our upcoming
> obligations.***

(Emphasis added).

**ANSWER TO NO. 83:**    Defendants refer to the full text of GGP's January 8, 2008

press release "General Growth Announces Capital Roadmap for 2008 and 2009" for its true

meaning and effect.  Except as expressly admitted herein, the allegations contained in this

paragraph are denied.

84.     On January 18, 2008, the Company issued another press release announcing the arrangement of three new mortgage loans and the pending sale of two wholly owned office buildings. This press release was filed with the SEC on Form 8-K. The press release stated, in pertinent part, as follows:

> One of the new loans is a five year interest only loan in the amount of $150 million, which will bear interest at a fixed rate of 5.05%. It will replace an existing mortgage loan in the amount of approximately $108 million and generate approximately $42 million of excess refinancing proceeds that will be distributed to the partners of the venture in which the property is held. Two additional ten year fixed rate loans, aggregating $181 million, have also been arranged. Loan payments will be interest only for the first three years and then will be based upon a thirty year amortization schedule for the remaining seven years. These two loans will replace existing loans in the amount of approximately $84 million, and will generate approximately $97 million of excess refinancing proceeds that will be distributed to the partners of the ventures in which the properties are held. The actual fixed rate of the interest on these two loans will be established on or prior to the day the loans are closed. All three of the aforementioned loans are expected to close on or before February 1, 2008.
>
> ***Consistent with our previously announced capital roadmap for 2008 and 2009, the Company is currently negotiating with numerous lenders the terms and conditions of approximately eight to twelve new fixed rate long term mortgage loans on two joint venture assets and the remainder on wholly owned assets. Some of these new nonrecourse mortgage loans would be placed on unencumbered properties which would enable the Company to use 100% of the proceeds for working capital and/or to reduce other debt.*** With respect to those properties with existing mortgage debt, the new loans would in all cases be closed prior to the maturity date of the existing loan and would generate excess refinancing proceeds which would also be available for working capital and/or to reduce other debt. The Company currently expects to close on some or all of the aforementioned loans on or before March 31, 2008.
>
> The Company has previously disclosed details of property mortgages that will mature during the second half of 2008. Although it is not possible to accurately predict the availability of commercial mortgage financing in the future, the Company believes that the supply of financing will increase later in the year. Accordingly, the Company does not believe that it is appropriate to currently seek commitments to replace other mortgages that will mature six or more months from now. Nevertheless, the Company

> expects to maintain continuous ongoing discussions with numerous sources of commercial mortgage funding and to obtain timely commitments for new long term fixed rate loans well in advance of scheduled mortgage maturity dates.
>
> Finally, the Company has entered into a binding agreement to sell two wholly owned office buildings. The aggregate sale price is approximately $96 million which corresponds to an approximate 6% capitalization rate on property income. Due diligence has been completed and the transaction is expected to close prior to the end of January, 2008. The Company expects to report a gain of approximately $38 million.

(Emphasis added).

**ANSWER TO NO. 84:**   Defendants refer to the full text of GGP's January 17, 2008 press release "General Growth Announces New Mortgage Loans and the Sale of Two Office Buildings" (which was filed with the SEC on Form 8-K) for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

85.    Defendant Freibaum also commented as follows:

> General Growth is very proud of its 50+ year unblemished record of paying every single loan upon its maturity. This is a remarkable accomplishment. In the current impaired availability of credit environment, lenders prefer to make loans to highly qualified sponsors and operators like General Growth. ***As we are seeking very conservative loans with high debt service coverage and loan-to-values of only 50%-60%, we are receiving significant levels of interest from lenders.***

(Emphasis added).

**ANSWER TO NO. 85:**   Defendants refer to the full text of GGP's January 17, 2008 press release "General Growth Announces New Mortgage Loans and the Sale of Two Office Buildings" for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

86.     On January 19, 2008, the Company issued another press release to dispel rumors that it would be forced to file for bankruptcy and reassure investors that its financial and operating condition and prospects were sound. This press release was filed with the SEC on Form 8-K. The press release stated, in pertinent part, as follows:

> The Company would ordinarily not respond to these types of statements and suggestions, but in light of the ***current fragile condition of the real estate capital markets,*** it believes that it is now both imperative and in the best interests of its creditors, stockholders and employees to do so immediately. The Company responds with the following factual statements:
>
> • ***The Company is absolutely not in any danger of having to contemplate a bankruptcy filing, and the Company unequivocally has no intention of doing so.***
>
> • ***Since its formation over 50 years ago, the Company has borrowed and repaid billions of dollars of loans and has never failed to pay any loan upon maturity.***
>
> • ***Using conservative third party views of the current private market value of our real estate, there is currently at least $15 billion of equity value in excess of all of our debt and liabilities.*** With approximately 300 million outstanding shares and equivalent operating partnership units, this $15 billion of equity value in excess of debt and liabilities translates into a value of $50 per share, more than 50% above our closing price of $32.86 on Friday, January 18, 2008. Other experts place the value of our real estate above our debt considerably higher than $50 per share.
>
> • ***Conservative loan-to-property-value mortgage loans are in fact currently available to the Company for its income producing commercial properties.*** As previously set forth in the Company's press releases on January 8th and 17th, because of the strong property income for financing purposes on these properties, the Company will be able to obtain mortgage loans at conservative loan-to-property-value ratios of 50%-60%.
>
> • Newspaper stories and blogs have compared GGP to other companies or individuals that recently utilized multi-billion dollar short term acquisition loans that are coming due in February of 2008. The Company has no such multi-billion dollar loans. The last material acquisition made by the Company was the purchase of The Rouse Company, which *closed* in November of 2004. At that time, an $8 billion four-

year acquisition loan was obtained to complete the
approximately $14 billion purchase. By early 2006, almost
two years before it was due, the acquisition loan was repaid
in full.

• **The Company also owns unencumbered income producing
and development in progress properties that the Company
believes have a value for financing purposes of at least
$2.5 billion.** These assets can be used through a variety of
means to raise substantially more capital than could be
required, even under the most "doomsday" of future possible
scenarios for how the current commercial retail real estate
markets might evolve over the next two years.

• **Despite current indications of softening specialty retail
sales, our malls are well occupied pursuant to long-term
leases. Taking into account actual 2007 Comparable NOI
growth, and even assuming a weaker overall economy, the
Company continues to expect Comparable NOI growth will
average at least 5% for 2007-2009.**

(Emphasis added).

  **ANSWER TO NO. 86:** Defendants refer to the full text of GGP's January 19, 2008

press release "General Growth Responds to Recent Statements in the Press and Blogs" (which

was filed with the SEC on Form 8-K) for its true meaning and effect.  Except as expressly

admitted herein, the allegations contained in this paragraph are denied.


  87. Despite the Company's assurances to investors and Plan Participants that it
could withstand the nationwide real estate collapse and timely satisfy all of its debt
obligations, the Company's Stock price continued to decline. On January 22, 2008, the
Company Stock price closed at $34.43 per share, down 46 percent since the beginning of the
Class Period.

  **ANSWER TO NO. 87:** Defendants admit that GGP stock closed at $34.43 on

January 22, 2008.  Except as expressly admitted herein, the allegations contained in this

paragraph are denied.


  88. On February 11, 2008, the Company issued a press release announcing its
fourth quarter and year end results for the period ending December 31, 2007. For the full

year 2007, Core FFO per fully diluted share was $2.97 as compared to $2.96 for the full year 2006. For the fourth quarter 2007, Core FFO per fully diluted share was $0.92 versus $0.99 of Core FFO per fully diluted share in the comparable 2006 quarter. For the full year, EPS was $1.18 in 2007 as compared to $0.24 in 2006. EPS were $0.24 for the fourth quarter of 2007 versus EPS of $0.29 in the fourth quarter of 2006. FFO per fully diluted share for the full year 2007 were $3.71 in 2007 as compared to $3.06 of FFO per fully diluted share for the full year 2006. FFO per fully diluted share were $0.64 in the fourth quarter of 2007 and were $1.02 in the fourth quarter of 2006. This press release was filed with the SEC on Form 8-K.

**ANSWER TO NO. 88:**   Defendants refer to the full text of GGP's February 11, 2008

press release "General Growth Properties, Inc. Releases 2007 Results of Operations" (which was

filed with the SEC on Form 8-K) for its true meaning and effect.  Except as expressly admitted

herein, the allegations contained in this paragraph are denied.

89.     On that same date, Defendant Bucksbaum also commented on the results as follows:

> Our core retail real estate business continues to deliver solid operating results. ***We are prepared to handle the expected weaker economic environment and will be well positioned to benefit when the economy begins to show improvement.***

(Emphasis added).

**ANSWER TO NO. 89:**   Defendants refer to the full text of GGP's February 11, 2008

press release "General Growth Properties, Inc. Releases 2007 Results of Operations" for its true

meaning and effect.  Except as expressly admitted herein, the allegations contained in this

paragraph are denied.

90.     On February 12, 2008, the Company held a conference call with analysts and investors (which included Plan Participants) entitled "Q4 2007 General Growth Properties Inc. Earnings Conference Call." It was at this conference call that Defendant Freibaum stated in relevant part:

> No one knows when the economy will improve, but the vast majority of retailers are still profitable. Most of the merchants that have announced store closings or reduced expansion plans have had struggling or unpopular concepts that preceded the beginning

> of the current downturn in sales. Despite the already announced
> and anticipated additional reduced store counts and curtailed
> growth plans, ***we believe we can offset the majority*** *of the potential*
> ***lost revenue with greater operating efficiencies and increased***
> ***specialty and temporary rent income.***

(Emphasis added).

**ANSWER TO NO. 90:**    Defendants refer to the full text of GGP's February 12, 2008

Fourth Quarter 2007 Earnings Conference Call for its true meaning and effect.  Except as

expressly admitted herein, the allegations contained in this paragraph are denied.


91.    On February 27, 2008, the Company reiterated these results in its Annual Report
on Form 10-K filed with the SEC.

**ANSWER TO NO. 91:**    Defendants refer to the full text of GGP's Form 10-K for the

period ending December 31, 2007 for its true meaning and effect.  Except as expressly admitted

herein, the allegations contained in this paragraph are denied.


92.    Further concealing the true risks posed to the value of Company Stock by the
Company's substantial debt obligations, the Company addressed a letter to its shareholders
attached to the Company's 2007 Annual Report, and signed by Defendants Bucksbaum,
Michaels, Freibaum, and Schlemmer, stating in relevant part:

> By all the` measures mentioned above, our core retail business
> continued to improve in 2007. Unfortunately, the stock market
> took a different view of our performance. For only the second
> time in the last 14 years we did not deliver a stock price increase to
> our shareholders. However, ***our future remains full of positives***
> ***and excitement as a result of our predictable and growing sales,***
> ***occupancy and retail operating cash flows. The stock market has***
> ***acknowledged and responded to these inherent qualities in the***
> ***past. I look forward to its recognition again in the future.***

(Emphasis added).

**ANSWER TO NO. 92:**    Defendants refer to the full text of the letter to shareholders

included as part of GGP's 2007 Annual Report for its true meaning and effect.  Except as

expressly admitted herein, the allegations contained in this paragraph are denied.

93.    On March 19, 2008, the Company issued a press release announcing the closing on yet another loan, the sixth of 2008. This press release was filed with the SEC on Form 8-K. The press release stated, in pertinent part, as follows:

> This sixth loan represents the final loan expected to be completed in the first quarter. The total of these six new mortgage loans for both the wholly-owned and joint venture properties was $1.3 billion. There was existing debt on four of the properties totaling $550 million. Consequently, these new mortgage loans are expected to generate excess proceeds of $750 million. The Company's share of the excess proceeds is expected to be approximately $658 million. The funds have been used in part to purchase The Shoppes at Palazzo in Las Vegas, to make contributions to joint ventures and payments to joint venture partners, to repay existing debt including the last outstanding unsecured JP Realty Public Notes, and for general working capital purposes.
>
> During the second quarter of 2008, approximately $105 million of existing property loans, including the Company's 50% share of a joint venture mortgage loan, will mature. As of today, the Company is in various stages of discussions and/or due diligence with numerous lenders for new mortgage loans aggregating more than $2.5 billion. These potential mortgage loans are on income-producing properties that are currently unencumbered, as well as on properties with existing mortgages that will mature throughout the balance of 2008.
>
> In addition, the Company is also in various stages of discussions and/or due diligence with numerous parties regarding various types and forms of non-debt capital. Currently, the aggregate amount of new non-debt capital generated if all of the potential transactions close is expected to be approximately $1.75 billion. None of the non-debt capital transactions currently being discussed and/or pursued involve any public "capital markets"-type executions. All of the transactions, to the extent closed, would be private.
>
> At this time, the Company cannot be absolutely certain that any of these potential mortgage and non-debt transactions will in fact close during the second quarter of 2008. ***However, the Company currently anticipates at least $1.5 billion of aggregate mortgage and/or non-debt transactions will in fact close during the second quarter  anticipates at least $1.5 billion of aggregate mortgage and/or non-debt transactions will in fact close during the second quarter of 2008 and those transactions will produce at least $1 billion of excess proceeds.*** The Company expects to apply the

majority of those proceeds to repay a $722 million acquisition loan
and to use the balance for working capital purposes.

The Company will separately announce major financing
transactions, if any, as they occur. In addition to our regularly
scheduled first quarter 2008 earnings announcement and
supplemental information issued in conjunction with it, another
update of General Growth's capital raising activities will be
provided at or before the end of the second quarter of 2008.

Due to purchase accounting mark to market adjustments, the
amounts included in this press release for debt maturing in 2008 do
not strictly agree with amounts reported in accordance with
generally accepted accounting principles (GAAP). If such amounts
were reconciled to GAAP, the Company believes the reconciling
items would be quantitatively and qualitatively immaterial and
such debt amounts disclosed approximate the GAAP amounts.

(Emphasis added).

**ANSWER TO NO. 93:**   Defendants refer to the full text of GGP's March 19, 2008

press release "General Growth Announces First Quarter 2008 Mortgage Financings" (which was

filed with the SEC on Form 8-K) for its true meaning and effect.  Except as expressly admitted

herein, the allegations contained in this paragraph are denied.


94.    Despite the Company's deteriorating financial and operating condition and
prospects, on April 4, 2008, the Company issued a press release announcing it had declared a
$0.50 per share dividend payable to common stockholders on April 30, 2008. This press release
was filed with the SEC on Form 8-K.

**ANSWER TO NO. 94:**   Defendants refer to the full text of GGP's April 4, 2008 press

release "General Growth Properties Declares Quarterly Dividend on Common Stock" (which

was filed with the SEC on Form 8-K) for its true meaning and effect.  Except as expressly

admitted herein, the allegations contained in this paragraph are denied.


95.    On April 16, 2008, *Bloomberg News*, in an article entitled "General Growth
Searching for Joint Venture Partners, WSJ Says," reported that the Company was searching for
joint venture partners to obtain needed capital to pay off $18.7 billion in debt due over the next
four years. This report stood in stark contrast to the information previously disclosed by the

Company and its senior officers earlier in the Class Period. The Company did not refute the *Bloomberg News* article.

**ANSWER TO NO. 95:**   Defendants refer to the full text of the April 16, 2008

Bloomberg News article, "General Growth Searching for Joint Venture Partners, WSJ Says" for

its true meaning and effect.  Except as expressly admitted herein, the allegations contained in this

paragraph are denied.

96.     On April 29, 2008, after the market closed, the Company issued a press release announcing its financial results for the first quarter of 2008. The Company reported Core FFO per fully diluted share were $0.76 for the first quarter of 2008 as compared to $0.65 in the comparable period of 2007. FFO per fully diluted share were $0.75 for the first quarter of 2008, as compared to $1.66 reported in the first quarter of 2007. EPS was $0.03 for the first quarter of 2008 as compared to $0.94 in the comparable 2007 period. This press release was filed with the SEC on Form 8-K.

**ANSWER TO NO. 96:**   Defendants refer to the full text of GGP's April 29, 2008 press

release "General Growth Properties, Inc. Announces First Quarter 2008 Results of Operations"

(which was filed with the SEC on Form 8-K) for its true meaning and effect.  Except as expressly

admitted herein, the allegations contained in this paragraph are denied.

97.     Defendant Bucksbaum also commented on the results as follows:

> Strong comparable operating results at our malls demonstrate that our business prospects remain positive. ***Despite the challenging economic environment, our malls remain a very attractive venue for our customers to shop, for our retailers to do business, and for our lenders to lend. We remain confident as we look to the future.***

(Emphasis added).

**ANSWER TO NO. 97:**   Defendants refer to the full text of GGP's April 29, 2008 press

release "General Growth Properties, Inc. Announces First Quarter 2008 Results of Operations"

for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in

this paragraph are denied.

98.     On April 30, 2008, on the Company's first quarter 2008 earnings conference call, Defendants made the following statements:

> Michael Bilerman – *Citi – Analyst*:
>
> It's Michael Bilerman here with Ambika as well. Bernie, can you just go over — you had Fashion Show and Palazzo, which have a maturity date later this year I'm not sure if you have extension options there. Can you just go over those loans as well? What proceeds did you use to repay the $522 million on the bridge?
>
> [Defendant Freibaum]:
>
> I can answer the latter part first. As I said, we got $375 million of new mortgages, so that was $375 million out of the $522 million. The other $147 million was the combination of cash that we had left over from the equity offering that we did at the end of March plus a small amount of draw on our revolving credit facility.
>
> The mortgages on Fashion Show and Palazzo were very purposeful when we did them in January, and they each had a different rationale. Palazzo is a brand-new project. It's just opening. Many of the tenets are not open yet. The sales there, given the project that it's located in, is still opening in some ways with respect to the rooms that are available; getting the people that come to Las Vegas more familiar with the project; and the structure under which we purchased the asset, whereby we paid an initial price based on estimated NOI and then there will be additional payments throughout the next three years that will take into account the additional NOI. So any type of a long-term mortgage on Palazzo made no sense whatsoever.
>
> And in fact, we wanted it to be near the end of the year because the mortgage on the adjoining property, which is literally physically connected to the Palazzo, the Grand Canal Shoppes, it comes due in May, I believe, of `09, but it's open to be prepaid in early `09.
>
> And the huge improvement in NOI that we have had on that center compared to. when we purchased it, will provide us a huge amount of additional proceeds, which may make sense for us to take the Palazzo and the Grand Canal Shoppes and get a new mortgage that covers both of those assets. So we wanted the flexibility to potentially combine those two at year end or perhaps do something else.
>
> Fashion Show is a little bit of a different situation. The income there continues to grow very significantly, well ahead of our comp NOI average, and we expect that to continue. There are other

things that we've been telling people for years that we're trying to
get done there, including getting a certain portion of the project
land in the Northeast corner under control, where we might be able
to do additional development of that site, given its highly lucrative
location right on the strip. So we wanted that flexibility.

In January when that mortgage came due, we had offers from
groups of life companies. We could have done a five-year or a ten-
year mortgage at the same proceeds level, but given the things we
want to change there and the outside growth in NOI, we didn't
want to commit to a long-term mortgage there either. So given that
those are two of our very best assets in our top five, ***no doubt, we
have little concern about the ability to refinance them at the
end of this year when they come due.***

(Emphasis added).

**ANSWER TO NO. 98:**   Defendants refer to the full text of GGP's April 30, 2008 First

Quarter 2008 Earnings Conference Call for its true meaning and effect.  Except as expressly

admitted herein, the allegations contained in this paragraph are denied.

99.     On July 31, 2008, on the Company's second quarter 2008 earnings conference
call, Defendants made the following statements:

[Defendant J. Bucksbaum]:

[W]e have refinanced every mortgage that has come due in 2008,
and we have multiple Plan and options available to us to take care
of our remaining 2008 and 2009 maturities.

[Defendant Freibaum]:

[W]e currently have five additional wholly-owned malls and one
joint venture mall that will mature in the fourth quarter of this year
that still need to be refinanced. We anticipate closing a one-off
replacement loan for the existing joint venture mortgage that will
mature on November 10, 2008. We currently expect that the new
loan will be for a much higher amount than the maturing loan, as
we believe that the expiring loan represents only approximately
25% of the value of the property. Excess loan proceeds will be
distributed to the partners, and our ownership share is 35%.

We currently anticipate that four of the aforementioned five wholly-owned malls, including Fashion Show mall, will be part of a much larger pool of properties that will include many other malls, with loans that mature in the first or second quarter of 2009. We are currently planning to sell only investment-grade rated bonds to numerous fixed-income investors.

It is incorrect to extrapolate that these bonds would sell for spreads that are similar to those that are currently available on re-sales of existing investment-grade CMBS notes. Existing CMBS notes of various vintages represent portions of loans on many assets of different qualities and risk profiles. The unrelated loans were made to different borrowers, and much less rigorous underwriting standards were utilized in the past.

In addition, for reasons unrelated to the quality of the loans, many holders of existing CMBS bonds are currently being forced to liquidate their positions at deeply depressed prices. We will offer new bond secured by conservatively leveraged, high-quality malls with stable and predictable cash flow. The malls are all owned and operated by general growth and will be cross-collateralized to provide further downside protection for the bondholders.

***Our discussions with a number of institutional fixed-income investors, that are potential buyers of the bonds, lead us to believe that there will be considerable interest on the part of very large debt players.*** There have been virtually no new freshly underwritten investment-grade rated secured mortgage-backed bonds made available to the fixed income investor market for quite some time.

We currently anticipate offering these bonds for sale in mid-October or about 2.5 months from now. The actual number of malls that are part of the pool with loans that mature in 2009 will depend upon the amount of demand that we have for the bonds in October. That said, we currently anticipate that we will probably sell at least $1 billion of bonds in mid-October.

As I previously said, Fashion Show mall will anchor the pool. It is one of only a handful of malls in the entire United States with current sales in excess of $1,100 per square foot, so it should generate a lot of debt investor interest. If there is additional demand at that time, we have enough malls that could be prepaid at par,

such that we could sell as much as $2 billion of secured mortgage-backed bonds in mid-October.

As it just recently debuted, with some stores yet to open, the Shoppes at Palazzo are still not close to reaching their full cash flow potential. The Palazzo stores are contiguous to the Grand Canal Shoppes, which have current sales productivity of almost $1,200 per square foot. ***We currently anticipate refinancing both properties at the same time in early 2009. We could either do a one-off club deal for a single mortgage secured by both the Grand Canal Shoppes and the Shoppes at Palazzo, or we could use both 'properties to anchor a second pool of cross-collateralized malls, for which we would offer freshly underwritten and newly rated secured mortgage bonds in the first quarter of 2009.***

\*       \*       \*

Now I would like to address capital Plan for the intermediate term. Given the current constraining general availability of commercial mortgage financing, I am reluctant to precisely predict the amount of excess mortgage proceeds that we can generate over the next two years, as we replace our mortgage loans that will mature in 2009 and 2010. That said, our share of existing mortgage loans that will mature in 2009 is approximately $2.5 billion. Using what I believe is a conservative average cap rate of 6.75%, the assets encumbered by those mortgages would be valued at approximately $6.2 billion. Accordingly, the existing mortgages maturing in 2009 represent approximately 40% of the average value of those assets.

***If, on average, we were to refinance all of the expiring 2009 mortgages at a 55% average loan to value level, we would generate approximately $900 million of excess proceeds in 2009.*** For hypothetical purposes only, if the weighted average constant on the new mortgage loans, including amortization, was 7%, the initial total debt service coverage would be approximately 1.75 times. ***For a mortgage investor, that represents very high and secure coverage for a mall with stable cash flow.***

\*       \*       \*

Now the last-July $750 million unsecured bridge loan has been fully refinanced, our next significant maturity of non-mortgaged

debt comes in March and April of 2009. At that time, an aggregate amount of $595 million of Rouse Company bonds will be due.

During the nine-month period from August 1, 2008 through April 30, 2009, we currently anticipate raising at least $750 million from the various types of non-debt capital that we described in our roadmap. To refresh your recollection, these items include proceeds from the sale of non-core assets, primarily office buildings; preferred equity on individual under-leveraged malls with existing low leverage mortgages that don't mature for a number of years; and proceeds from entering into new joint ventures for malls that are currently wholly-owned.

During the next nine months, market conditions will determine the actual timing, dollar amounts, and the mix of non-debt capital that we will raise from each of the aforementioned or other possible sources. If general economic conditions improve, we can envision raising substantially more than $750 million. However, regardless of market conditions, we believe we can achieve our minimum objective. If we have completed a second major secured mortgage-backed bond financing prior to the maturity of the Rouse bonds, excess proceeds from that transaction would also be available to repay those bonds.

(Emphasis added).

**ANSWER TO NO. 99:**   Defendants refer to the full text of GGP's July 31, 2008

Second Quarter 2008 Earnings Conference Call for its true meaning and effect.  Except as

expressly admitted herein, the allegations contained in this paragraph are denied.

100.    On August 8, 2008, the Company filed a Form 10-Q with the SEC, which stated in part:

Liquidity and Capital Resources.

As of June 30, 2008, we have approximately $2.42 billion and $3.08 billion in debt maturing in 2008 and 2009, respectively (see also Note 4). Approximately $837 million of such debt was refinanced in July 2008 and we are currently considering various types and forms of transactions to refinance the remaining debt, including mortgage financings, construction financings, other debt and preferred equity financings, venture partner equity capital and sales of non-core assets. In light of current retail and credit market conditions, we have also elected to defer for eighteen months approximately $500 million of development and redevelopment expenditures. We believe that such deferral will enhance the

likelihood that these deferred development and redevelopment projects will open when general economic conditions are more favorable and when attractive financing is more generally available. Although such deferral reduces our current approved future development spending to approximately $1.03 billion, such amount is less than the aggregate costs necessary to complete all currently planned projects.

***We currently anticipate that we will be able to repay or refinance all of our debt on a timely basis, and believe we have adequate sources of funds to meet our short term cash needs.*** However, given the continued weakness of the retail and credit markets, there can be no assurance that we can obtain such refinancing or additional capital on satisfactory terms. In the event that we are unable to refinance our debt on a timely basis and on acceptable terms, we will be required to take further steps to acquire the funds necessary to satisfy our short term cash needs ... .

(Emphasis added).

**ANSWER TO NO. 100:**   Defendants refer to the full text of GGP's Form 10-Q for the period ending June 30, 2008 for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

101.   Defendant J. Bucksbaum signed a certification which stated:

In connection with the Quarterly Report of General Growth Properties, Inc. (the "Company") on Form 10-Q for the period ending June 30, 2008, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, John Bucksbaum, in my capacity as Chief Executive Officer of the Company, do hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13 (a) or 15 (d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**ANSWER TO NO. 101:**   Defendants refer to the full text of GGP's Form 10-Q for the period ending June 30, 2008 for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

102.     On August 8, 2008, GGP Stock closed at a trading price of $27.48 per share.

**ANSWER TO NO. 102:**     Defendants admit the allegations in this paragraph.

### The Truth Begins to Emerge

103.     As the investing public became aware of General Growth's rising debt obligations, namely, that the Company had amassed billions of dollars in debt that it could not sufficiently repay or refinance, the price of GGP Stock plummeted throughout the Class Period.

**ANSWER TO NO. 103:**     Defendants admit that the price of GGP stock declined during

the putative class period.  Defendants refer to GGP stock's daily closing price, as reflected in

publicly available databases.  Except as expressly admitted herein, the allegations contained in

this paragraph are denied.

104.     On September 22, 2008, the Company issued a press release entitled "General Growth Pursues Debt Reduction and Strategic Alternatives," which stated in part:

> General Growth Properties, Inc. today announced that the Company's Board of Directors and management team is pursuing a comprehensive evaluation of its alternatives, both financial and strategic, in an effort to align the market value of the Company's common stock more closely with the intrinsic value of the Company's stable, high quality portfolio of real estate assets in good locations with significant barriers to entry. Occupancy reached a record high of 93.2% in the second quarter of 2008 and comparable net operating income continued to increase, even in a challenging consumer sales environment.
>
> The Company currently anticipates that it will be in a position to offer a long-term fixed-rate portfolio mortgage financing to lenders in mid to late November, and *in the interim will actively pursue several sources of financing for the Company's near term maturing obligations.* The Company and its advisors are also developing a comprehensive, strategic plan to generate capital from a variety of potential sources including, but not limited to, both core and non-core asset sales, the sale of joint venture or preferred equity in selected pools of its assets, a corporate level capital infusion, and/or strategic business combinations.

(Emphasis added).

**ANSWER TO NO. 104:**   Defendants refer to the full text of GGP's September 22,

2008 press release "General Growth Pursues Debt Reduction and Strategic Alternatives" for its

true meaning and effect.  Except as expressly admitted herein, the allegations contained in this

paragraph are denied.

 

105.   As a result of this disclosure, General Growth's Stock price dropped from a
closing price of $21.42 per share on September 19, 2008 to $16.08 per share on September 22,
2008, the next trading day.

**ANSWER TO NO. 105:**   Defendants admit GGP stock closed at $21.42 on

September 19, 2008, and at $16.08 on September 22, 2008.  Except as expressly admitted herein,

the allegations contained in this paragraph are denied.

 

106.   On October 1, 2008, *The Wall Street Journal* published an article entitled
"General Growth Properties' High-Risk Strategies Hit Home — Big Debts Incurred To Build Up
Firm, Executives' Stock." Among other things, the article discussed insider stock sales by the
Company's senior executives (which occurred throughout the Class Period) in the aggregate
amount of approximate $112 million, and stated in part:

> Senior executives at ***General Growth Properties Inc. built up
> the mall owner by loading it with debt and amassed their own
> wealth by borrowing heavily to buy its shares.***
>
> ***Now, both high-risk strategies have come crashing down.
> General Growth's stock has cratered some 73% in the past year
> as investors have worried about the company's ability to repay its
> $27 billion in debt*** Since early August, Chief Financial Officer
> Bernie Freibaum, Chief Operating Officer Bob Michaels and seven
> other executives have sold a collective 5.6 million of their shares –
> for rough $112 million.
>
> \*     \*     \*
>
> ***Coming problems include the company's need to refinance
> $1 billion in mortgages*** tied to its Fashion Show mall and Shoppes
> at the Palazzo, both in Las Vegas, which is due in November.
> Another thorny problem: The company has to repay $600 million
> in unsecured bonds in the spring. ***It is far from clear General***

> *Growth will be able to refinance that amount given the decline in*
> *retail values nationally and the tightness in the global credit*
> *markets.*

(Emphasis added).

**ANSWER TO NO. 106:** Defendants refer to the full text of the Wall Street Journal's

October 1, 2008 article "General Growth Properties' High-Risk Strategies Hit Home – Big Debts

Incurred to Build Up Firm, Executives' Stock" for its true meaning and effect. Except as

expressly admitted herein, the allegations contained in this paragraph are denied.


107.    Subsequent to this disclosure, General Growth's Stock price dropped from
$14.62 per share to $7.59 per share the next day.

**ANSWER TO NO. 107:** Defendants admit GGP stock closed at $14.62 on October 1,

2008, and at $7.59 on October 2, 2008. Except as expressly admitted herein, the allegations

contained in this paragraph are denied.


108.    On October 3, 2008, Company issued a press release entitled "General Growth
Properties Announces Executive Change and Dividend Suspension," which stated in part:

> General Growth Properties, Inc. today announced the appointment
> of Edmund Hoyt as the Company's Chief Financial Officer on an
> interim basis. Mr. Hoyt succeeds Bernard Freibaum, who is no
> longer employed by the Company. The Company will promptly
> commence a search for a permanent chief financial officer.
>
> Mr. Hoyt has served as Senior Vice President and Chief
> Accounting Officer of the Company since 2000. Mr. Hoyt has
> been with the Company since 1986 and has held a variety of
> positions in financial planning, accounting and controllership
> roles.
>
> All continuing executive officers of the Company have informed
> the Company that they have repaid in full all previously existing
> margin loans and thus there will be no further sales of Company
> stock by those executive officers to satisfy margin calls. In
> addition, the Bucksbaum family interests have informed the
> Company that they have not sold any shares of Company stock and
> that they do not intend to sell any of their shares of Company
> stock. The Company has been informed by Mr. Freibaum that on

October 2, 2008, he sold approximately 2.95 million shares of common stock to satisfy margin calls and applied all of the proceeds to repay outstanding margin debts. After those sales, Mr. Freibaum has informed the Company that he beneficially owns approximately 1.3 million shares of stock and has approximately $3.4 million of margin debt outstanding.

*The Company also announced that, given the uncertainty and volatility in the capital markets, and the fact that all distributions currently required to maintain REIT status have already been made this year, the Company's board of directors has determined to suspend the common stock dividend at this time.* Such suspension will be reviewed by the Board in the context of the REIT requirements and the Company's ongoing capital position.

(Emphasis added).

**ANSWER TO NO. 108:**   Defendants refer to the full text of GGP's October 3, 2008 press release "General Growth Properties Announces Executive Change and Dividend Suspension" for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

109.   Also on October 3, 2008, the *Chicago Tribune* published an article entitled "General Growth stock slides on report; Executives sold $40 million in shares."  The article stated in part:

Shares of General Growth Properties Inc. *fell 48 percent Thursday to a 12 year low as investors grew concerned that the Chicago-based shopping mall operator won't be able to refinance almost $1 billion in debt that comes due in November.*

\*        \*        \*

The nation's second-largest shopping mall operator finds itself in a difficult spot as the credit markets have tightened and complicated its efforts to refinance $900 million in mortgage debt related to two shopping mall properties in Las Vegas. The debt is up for renewal Nov. 28, Laverty said.

(Emphasis added).

**ANSWER TO NO. 109:**   Defendants refer to the full text of the Chicago Tribune's October 3, 2008 article "General Growth stock slides on report; Executives sold $40 million in shares" for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

110.   As discussed in the *Chicago Tribune* article, the Company's senior executives sold approximately $40 million worth of GGP Stock in the three days following its successful lobbying efforts to have the Company placed on the "no short-sale" list of companies:

> The real estate investment trust's stock dropped $7.03, to $7.59, after San Francisco-based **shareholder advisory firm Glass, Lewis & Co. issued a report Wednesday chastising General Growth executives for selling shares after they had lobbied to get the company on the no short-selling stock list.**
>
> *         *         *
>
> **"It's time to end this charade,"** Glass, Lewis & Co. analyst Todd Fernandez said in the report.  **"If executives want to sell their stock, investors should be provided the same opportunity."**

(Emphasis added).

**ANSWER TO NO. 110:**   Defendants refer to the full text of the Chicago Tribune's October 3, 2008 article "General Growth stock slides on report; Executives sold $40 million in shares" for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

111.   That same day, *a Business Week* news article entitled "General Growth Properties Staggers Under Debt Load" remarked how analysts believe that Defendant Bucksbaum had put General Growth "deep into hock as he bought up retailing real estate across the country."

**ANSWER TO NO. 111:**   Defendants refer to the full text of Business Week's October 3, 2008 article "General Growth Properties Staggers Under Debt Load" for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

112.     On October 6, 2008, Stifel's analyst David Fick issued a report to investors stating that General Growth had bought too many properties using debt financing, which would soon come up for refinancing. Specifically, he stated that "[t]he remaining 2008 mortgage maturities could prove difficult to refinance due to the large loan balances," including $650 million at its Fashion Show Mall property and $250 million at its Palazzo property.  Mr. Fick noted the risk that management might have to raise money by selling shares, which would make current shareholders' holdings less valuable.

**ANSWER TO NO. 112:**   Defendants refer to the full text of Stifel Nicolaus' October 6, 2008 analyst report "A Poster Child For Leverage – What Happens When Debt Goes Bad" for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

113.     Immediately following this disclosure, General Growth's Stock price dropped from $7.75 per share to $4.50 per share the next trading day.  This drop in General Growth's Stock price was a result of the artificial inflation caused by the Company's misleading public statements coming out of the Company Stock price.

**ANSWER TO NO. 113:**   Defendants admit that GGP stock closed at $7.75 on October 6, 2008, and at $4.50 on October 7, 2008.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

114.     An October 8, 2008 news article in *The Wall Street Journal* entitled "General Growth's Free Fall" explained that General Growth "has struggled for the past year to refinance largest U.S. mall owner by number of properties." The article further reported that $1.2 billion in debt was coming later this year, including approximately $900 million in mortgages due in late November on two malls on the Las Vegas Strip. It also noted that GGP Stock had dropped 70% in the past month "amid concerns about the Company's $27 billion debt burden, the departure of Chief Financial Officer Bernie Freibaum last week and hefty stock sales by company executives to cover margin calls" and that GGP Stock was down 83% for the year and trading below the value of its more than 200 U.S. malls, which was estimated to be more than $40 a share.

**ANSWER TO NO. 114:**   Defendants refer to the full text of the October 8, 2008 Wall Street Journal article "General Growth's Free Fall" for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

115.    On October 27, 2008, the Company issued a press release entitled "General Growth Announces Management Changes; Company Intends to Market Certain Las Vegas Properties for Sale." The release stated in part:

> General Growth Properties, Inc. today announced that two independent directors of the company will assume senior management positions effective immediately. Adam Metz will serve as interim Chief Executive Officer, and Thomas H. Nolan Jr. will serve as interim President, positions previously held by John Bucksbaum and Robert A. Michaels, respectively. Mr. Bucksbaum will continue to serve as Chairman and Mr. Michaels will *continue* to serve as Chief Operating Officer and a senior officer of the company. In order to maintain a majority of independent directors, Mr. Michaels has also given up his Board seat.
>
> *        *        *
>
> Along with other assets currently being marketed, the company's Board of Directors and management team have elected to market for sale its portfolio of retail properties in Las Vegas, NV: Fashion Show Mall, Grand Canal Shoppes, and The Palazzo. Goldman, Sachs & Co. and Eastdil Secured will be jointly responsible for the marketing effort, which is expected to begin immediately. In conjunction with the sale process, the company is working with its syndicate of lenders on Fashion Show Mall and The Palazzo to extend the November 28, 2008 maturity date. The company continues to remain current on all of its debt obligations.
>
> *        *        *
>
> The Company also announced that it has recently come to the attention of the Board that an affiliate of a Bucksbaum family trust advanced unsecured loans to Mr. Michaels and Bernard Freibaum, the company's former director and CFO, for the purpose of repaying personal margin debt relating to company stock. The loan to Mr. Michaels, which totaled $10 million, has been repaid in full. The loan to Mr. Freibaum, whose employment was terminated prior to the Board's knowledge of these loans, totaled $90 million and has $80 million presently outstanding.

**ANSWER TO NO. 115:**    Defendants refer to the full text of GGP's October 27, 2008 press release "General Growth Announces Management Changes – Company Intends to Market Certain Las Vegas Properties for Sale" for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

116.    Immediately following this disclosure, General Growth's Stock price dropped from $2.17 per share to $1.97 per share the next trading day.

**ANSWER TO NO. 116:**    Defendants admit that GGP stock closed at $2.17 on

October 24, 2008, and at $1.97 on October 27, 2008.  Except as expressly admitted herein, the

allegations contained in this paragraph are denied.

117.    On November 5, 2008, General Growth issued a press release announcing its 2008 third quarter results of operations. A November 5, 2008, *Reuters* news article entitled "General Growth FFO shares crater after results," summed up the announcement by stating that General Growth "posted lower quarterly results, slashed its full-year forecast and does not expect to pay a dividend in the near term." As the *Reuters* article observed, this announcement sent shares of General Growth common stock down more than 40%.

**ANSWER TO NO. 117:**    Defendants refer to the full text of GGP's November 5, 2008

press release "General Growth Properties, Inc. Reports Operating Results For Third Quarter

2008" and the November 5, 2008 Reuters UK article "General Growth FFO shares crater after

results" for their true meaning and effect.  Except as expressly admitted herein, the allegations

contained in this paragraph are denied.

118.    On November 5, GGP Stock closed at a price of $2.25 per share, down from a November 4 closing price of $4.49 per share.

**ANSWER TO NO. 118:**    Defendants admit that GGP stock closed at $4.49 on

November 4, 2008, and at $2.25 on November 5, 2008.  Except as expressly admitted herein, the

allegations contained in this paragraph are denied.

119.    According to that same *Reuters* article, UBS analyst Jeffrey Spector commented on the Company's earnings announcement by writing "Plain and simple, not good" in a research note, adding that UBS was placing General Growth's price target and stock rating under review.

**ANSWER TO NO. 119:**    Defendants refer to the full text of the November 5, 2008

Reuters UK article "General Growth FFO shares crater after results" for its true meaning and

effect.  Except as expressly admitted herein, the allegations contained in this paragraph are

denied.

120.    In a Form 10-Q SEC filing submitted after trading on November 10, 2008, General Growth acknowledged the likelihood of a bankruptcy filing resulting from its financing difficulties:

> In the event that we are unable to extend or refinance our debt or obtain additional capital on a timely basis and on acceptable terms, we will be required to take further steps to acquire the funds necessary to satisfy our short term cash needs, including seeking legal protection from our creditors. Our potential inability to address our 2008 or 2009 debt maturities in a satisfactory fashion raises substantial doubts as to our ability to continue as a going concern.

**ANSWER TO NO. 120:**   Defendants refer to the full text of GGP's Form 10-Q for the

period ending September 30, 2008 for its true meaning and effect.  Except as expressly admitted

herein, the allegations contained in this paragraph are denied.

121.    Throughout the Class Period, GGP Stock plummeted from a Class Period trading high of $65.81 per share on April 30, 2007 to a microscopic closing price of $0.49 per share on November 11, 2008, a drop of over 99% from the Class Period high.

**ANSWER TO NO. 121:**   Defendants admit that GGP stock traded at an intra-day high

of $65.81 on April 30, 2007, and closed at $0.49 on November 11, 2008.  Except as expressly

admitted herein, the allegations contained in this paragraph are denied.

122.    General Growth's credit ratings were downgraded as a result of its rising debt obligations and financing deficiencies. A November 14, 2008, CNNMoney.com news article entitled "General Growth's credit ratings downgraded" reported that "General Growth faces $900 million of debt secured by property that becomes payable on Nov. 28 and $600 million in unsecured debt at [Rouse Co. LP.] coming due in six months" and that Moody's Investors Service downgraded the ratings of General Growth and certain subsidiaries, "as concerns mounted about the company's ability to meet coming debt payments and other funding needs." The article also noted that Moody's "has 'deepening concerns' about the company's liquidity position in a tight credit market as earnings continue to be pressured by weak economic conditions."

**ANSWER TO NO. 122:**   Defendants refer to the full text of the November 14, 2008

Associated Press article "General Growth's credit rating downgraded" for its true meaning and

effect.  Except as expressly admitted herein, the allegations contained in this paragraph are

denied.

123.    As reported by a November 20, 2008 *AP* news article entitled "General Growth
confirms it has hired law firm: Embattled mall owner General Growth Properties confirms it's
hired law firm to study options:"

> General Growth's shares have lost 99 percent of their value over the
> past year amid concerns about the real estate investment trust's
> ability to sell debt, and turmoil in General Growth's executive ranks.
>
> Two weeks ago, the company reported disappointing third-quarter
> results, cut its year-end forecast and said it needs to refinance $900
> million in debt by the start of next month.

**ANSWER TO NO. 123:**   Defendants refer to the full text of the November 20, 2008

Associated Press article "General Growth confirms it has hired law firm:  Embattled mall owner

General Growth Properties confirms it's hired law firm to study options" for its true meaning and

effect.  Except as expressly admitted herein, the allegations contained in this paragraph are

denied.

124.    On February 26, 2009, General Growth filed its Form 10-K or the fiscal year
ended December 31, 2008 with the SEC, acknowledging that its tremendous debt obligations had
put the Company at risk of filing for bankruptcy. Specifically, the Form 10-K identified the
following risk factors faced by the Company:

> Bankruptcy Risks
>
> ***We may file for bankruptcy protection, or an involuntary petition
> for bankruptcy may be filed against us.***
>
> As described below under "Liquidity Risks," ***we have a substantial
> amount of debt which we may not be able to refinance or extend If
> we are unable to refinance or extend our debt, or if such debt is
> accelerated due to our default, our assets may not be sufficient to
> repay such debt in full, and our available cash flow may not be***

*adequate to maintain our current operations.* Under such circumstances, or if we believe such circumstances are likely to occur, we may consider or pursue various forms of negotiated restructurings of our debt and equity obligations and/or asset sales, which may be required to occur under court supervision pursuant to a voluntary bankruptcy filing under Chapter 11 of the U.S. Bankruptcy Code. In addition, under certain circumstances creditors may file an involuntary petition for bankruptcy against us. Due to the possibility of such circumstances occurring, we have begun active planning for such potential restructurings.

*If we file for bankruptcy protection, our business and operations will be subject to certain risks.*

A bankruptcy filing by or against GGP, GGPLP and certain of our subsidiaries (each referred to as a "filer") would subject our business and operations to various risks, including but not limited to, the following:

- A bankruptcy filing by or against a filer may adversely affect our business prospects and our ability to operate during the reorganization process ... .

- *The value of our common stock could be reduced to zero as result of a bankruptcy filing.*

\*       \*       \*

Liquidity Risks

*We may not be able to refinance, extend or repay our substantial indebtedness, which could have a materially adverse affect on our business, financial condition, results of operations and common stock price*

*We have a substantial amount of debt which we may not be able to extend, refinance or repay. As of December 31, 2008, we had an aggregate consolidated indebtedness outstanding of $24.85 billion* of which $6.58 billion was unsecured, recourse indebtedness of the Operating Partnership and consolidated subsidiaries, while $18.27 billion was secured by our properties. A majority of the secured indebtedness was non-recourse to us. This indebtedness does not include our proportionate share of indebtedness incurred by our Unconsolidated Properties. In December, 2008, we entered into forbearance agreements with the lenders for certain loans, as described elsewhere in this report.

*There can be no assurance that we will be able to refinance or*

***extend our debt on acceptable terms or otherwise.*** Our ability to refinance our debt is negatively affected by the current condition of the credit markets, which have significantly reduced levels of commercial lending. Our ability to successfully refinance or extend our debt is also negatively affected by recent downgrades of our debt by national credit ratings agencies as well as the real or perceived decline in the value of our properties based on continued significant deterioration of general and retail economic conditions, as discussed further below. Our substantial indebtedness also requires us to use a material portion of our cash flow to service principal and interest on our debt, which will limit the cash flow available for other business expenses or opportunities.

We do not have the cash necessary to repay our debt as it matures. Therefore, failure to refinance or extend our debt as it comes due, or a failure to satisfy the conditions and requirements of such debt, will result in an event of default under such debt and would allow the lender to accelerate such debt. In addition, a default under certain debt obligations could also constitute an event of default under other debt as a result of certain cross-default and cross collateralization provisions. Although we have entered into forbearance agreements with certain lenders pursuant to which they have agreed to refrain from exercising certain rights and remedies under specified loans, these agreements are subject to certain early termination provisions, and there can be no assurance that these forbearance agreements will be extended beyond their existing terms or that similar agreements will be reached with lenders of other debt in the event of a default by us. In the event we default under debt which is secured by one or more properties, we may be required to transfer such property or properties to the lender to satisfy the terms of such debt.

***If we are unable to refinance or extend our debt as it comes due and maintain sufficient cash flow, our business, financial condition, results of operations and common stock price will be materially and adversely affected, and we may be required to file for bankruptcy protection . .***

(Emphasis added).

      **ANSWER TO NO. 124:**   Defendants refer to the full text of GGP's Form 10-K for period ending December 31, 2008 for its true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

125.    In fact, General Growth was unable to satisfy or refinance its debt obligations. On April 16, 2009, General Growth announced that it was seeking relief to reduce and restructure its debts under chapter 11 of the U.S Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York. General Growth further announced that approximately 158 regional shopping centers owned by General Growth and certain other General Growth subsidiaries have also filed for bankruptcy protection.

**ANSWER TO NO. 125:**   Defendants refer to the full text of GGP's April 16, 2009

press release "General Growth Properties, Inc. Files For Chapter 11 Protection; Broken Credit

Markets Require GGP to Reduce and Restructure Debt" for its true meaning and effect.  Except

as expressly admitted herein, the allegations contained in this paragraph are denied.

126.    In an April 16, 2009 press release entitled "General Growth Properties, Inc. Files For Chapter 11 Protection; Broken Credit Markets Require GGP To Reduce And Restructure Debt," General Growth announced:

> The decision to pursue reorganization under chapter 11 came after extensive efforts to refinance or extend maturing debt outside of chapter 11. Over many months, the Company has endeavored to negotiate with its unsecured and secured creditors to obtain the time needed to develop a long-term solution to the credit crisis facing the Company. Unable to reach an out-of-court consensus, the Company reluctantly concluded that restructuring under the protection of the bankruptcy court was necessary.

**ANSWER TO NO. 126:**   Defendants refer to the full text of GGP's April 16, 2009

press release "General Growth Properties, Inc. Files For Chapter 11 Protection; Broken Credit

Markets Require GGP to Reduce and Restructure Debt" for its true meaning and effect.  Except

as expressly admitted herein, the allegations contained in this paragraph are denied.

127.    Consequently, that day, the New York Stock Exchange Regulation, Inc. announced that it had determined that General Growth's common stock should be suspended immediately, as dealings in such stock on the NYSE were no longer advisable. According to an April 16, 2009 press release entitled "NYSE Suspends Trading in General Growth Properties, Inc. and Moves to Remove from the List" issued by General Growth, the NYSE's decision to suspend General Growth common stock "was reached in view of the Company's April 16, 2009 announcement that it is voluntarily seeking relief to reduce and restructure its debts under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York."

**ANSWER TO NO. 127:**   Defendants refer to the full text of GGP's April 16, 2009

press release "NYSE Suspends Trading in General Growth Properties, Inc. and Moves To

Remove from the List" for its true meaning and effect.  Except as expressly admitted herein, the

allegations contained in this paragraph are denied.

128.    Thus, having been wiped out nearly entirely of its value, General Growth
common stock traded on the NYSE for the last day on April 15, 2009, closing at a price of
$1.05 per share.

**ANSWER TO NO. 128:**   Defendants admit that GGP stock closed at $1.05 on April 15,

2009.  Except as expressly admitted herein, the allegations contained in this paragraph are

denied.

129.    Beginning on April 17, in light of the suspension of trading on the NYSE, GGP
Stock started trading on the Pink Sheet Electronic Quotation Service under the symbol
"GGWPQ."

**ANSWER TO NO. 129:**   Defendants admit the allegations of this paragraph, except

that GGP's stock resumed trading on the New York Stock Exchange (NYSE) under the ticker

symbol GGP on March 5, 2010.

130.    On April 22, 2009, General Growth issued a press release entitled "General
Growth Properties, Inc. Additional Subsidiaries For Chapter 11 Protection," announcing that
certain subsidiaries, including eight regional shopping centers are also seeking relief under
chapter 11 in addition to those who sought bankruptcy relief on April 16. According to General
Growth, "[w]e filed these additional companies under chapter 11 as part of our overall plan to
restructure our debt."

**ANSWER TO NO. 130:**   Defendants refer to the full text of GGP's April 22, 2009

press release "General Growth Properties, Inc. Files Additional Subsidiaries for Chapter 11

Protection" for its true meaning and effect.  Except as expressly admitted herein, the allegations

contained in this paragraph are denied.

131.    On April 23, 2009, General Growth received a notice of delisting from the NYSE that the Company's common stock will be delisted from the NYSE as a result of General Growth's filing for bankruptcy protection. According to a Form 8-K filed by General Growth with the SEC on April 23, 2009, General Growth does not intend to take any action to appeal the NYSE's decision to delist General Growth common stock.

**ANSWER TO NO. 131:**   Defendants admit the first sentence of Paragraph 131.

Defendants refer to the full text of GGP's April 23, 2009 Form 8-K for its true meaning and

effect.  Except as expressly admitted herein, the allegations contained in this paragraph are

denied.

132.    By May 7, 2009, approximately 166 of the Company's regional malls and subsidiaries had also sought voluntary protection related to Chapter 11 filings.

**ANSWER TO NO. 132:**   Defendants admit that approximately 166 regional shopping

centers owned by GGP and certain other GGP subsidiaries sought relief to reduce and restructure

their debts under Chapter 11 of the U.S. Bankruptcy Code.  Except as expressly admitted herein,

the allegations contained in this paragraph are denied.

133.    On May 7, 2009, General Growth filed a Form 8-K with the SEC, describing its results of operations for the first quarter of 2009. The Company announced that its Core FFO for the first quarter of 2009 was a loss of $122.9 million, or $0.38 per fully diluted share, as compared to a positive $220.3 million, or $0.74 per fully diluted share for the first quarter of 2008. In addition, FFO per fully diluted share was a loss of $164.9 for the first quarter of 2009 as compared to a positive $216.9 million for the first quarter of 2008. In its Form 8-K, the Company explained that the "declines in Core FFO and FFO are primarily attributable to provisions for impairment, termination income and restructuring costs related to the development of alternatives to address our current liquidity and financing situations."

**ANSWER TO NO. 133:**   Defendants refer to the full text of GGP's May 6, 2009

Form 8-K for its true meaning and effect.  Except as expressly admitted herein, the allegations

contained in this paragraph are denied.

134.    Moreover, EPS for the first quarter of 2009 were a loss of $1.27 per share versus earnings of $0.01 per share in the first quarter of 2008.

**ANSWER TO NO. 134:**   Defendants refer to the full text of GGP's May 6, 2009

Form 8-K for its true meaning and effect.  Except as expressly admitted herein, the allegations

contained in this paragraph are denied.

135.    In that same Form 8-K, the Company highlighted the dramatic plunge in value of
General Growth Common Stock during the Class Period with the following chart:

| Capital Information | 3/31/2009 | 12/31/2008 | 12/31/2007 | 12/31/2006 |
|---|---|---|---|---|
| Closing common stock price per share | $0.71 | $1.29 | $41.18 | $52.23 |
| 52 Week High | $44.23 | $44.23 | $67.43 | $55.70 |
| 52 Week Low | $0.24 | $0.24 | $39.31 | $42.36 |
| Total Return — Trailing Twelve Months (share depreciation / appreciation and dividend) | -95.5% | -93.2% | -17.6% | 14.7% |

**ANSWER TO NO. 135:**   Defendants refer to the full text of GGP's May 6, 2009

Form 8-K for its true meaning and effect.  Except as expressly admitted herein, the allegations

contained in this paragraph are denied.

**Defendants Regularly Communicated With The Plan's Participants
Concerning Investment In General Growth Common Stock, Yet Failed To
Disclose The Imprudence Of Investment In GGP Stock**

136.    Defendants regularly communicated with Plan Participants about the
performance, future financial and business prospects of the Company and its Stock.  Defendants
fostered a positive attitude toward the Company's Stock and/or allowed Participants in the Plan
to follow their natural bias towards investing in the equities of their employer by not disclosing
negative material information concerning investment in the Company's stock.  As such,
Participants in the Plan were not informed about the true risks presented by investing in the
Company's stock and therefore could not make informed decisions regarding their investments in
the Plan.

**ANSWER TO NO. 136:**   Defendants admit the first sentence of this paragraph.

Defendants deny the remaining allegations contained in this paragraph.

137.    Indeed, throughout the Class Period, Defendants disseminated to Plan
Participants and filed with the SEC annual reports on Form 11-Ks and 10-Ks, and other public
statements that were inaccurate. The Plan documents incorporated by reference the Company's

false SEC filings. These and other SEC filings and related statements and releases were inaccurate, incomplete and misleading, and reported false financial results, causing the Plan and its Participants to acquire, hold and maintain Plan investments in GGP Stock and to invest in GGP Stock instead of other, alternative investments in the Plan.

**ANSWER TO NO. 137:**   Defendants deny the allegations contained in this paragraph.

### Defendants Knew Or Should Have Known That General Growth Stock Was An Imprudent Investment For The Plan

138.     At all relevant times, Defendants knew or should have known that the Company's over-aggressive real estate expansion was reckless in light of the collapsing housing market.  Defendants additionally knew or should have had known that the Company's expansion of real estate holdings caused it to incur billions of dollars in debt that it would not be able to satisfy or refinance when the debt became due, which made GGP Stock an imprudent investment for the Plan.

**ANSWER TO NO. 138:**   Defendants deny the allegations contained in this paragraph.

139.     Director Defendants had direct knowledge of the Company's substantial debt obligations, as evident by the "Bankruptcy Risks" identified in the Company's Form 10-K filed with the SEC on February 26, 2009.

**ANSWER TO NO. 139:**   Defendants refer to the full text of GGP's Form 10-K for the

period ending December 31, 2008 for its true meaning and effect.  Except as expressly admitted

herein, the allegations contained in this paragraph are denied.

140.     Yet, the Director Defendants failed properly to take into account the strong likelihood that General Growth would default on billions of dollars of debt and be forced to file for bankruptcy protection, or properly to consider the effect of the above on the value of GGP Stock when determining the prudence of investing and holding the Plan's assets in GGP Stock.

**ANSWER TO NO. 140:**   Defendants deny the allegations contained in this paragraph.

141.     Remarkably, even after the Company determined that it would require bankruptcy protection, and GGP Stock would be rendered virtually worthless, Defendants still failed to take any steps to ensure that Plan Participants' investments would be protected.

**ANSWER TO NO. 141:**   Defendants deny the allegations contained in this paragraph.

142.    As a result of Defendants' direct knowledge of and, at times, implication in, creating and maintaining public misconceptions concerning the true financial health and debt obligations of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plan's Participants regarding the Plan's investment in GGP Stock did not effectively inform Participants of the past, immediate, and future dangers of investing in GGP Stock.

**ANSWER TO NO. 142:**    Defendants deny the allegations contained in this paragraph.

143.    An adequate investigation by the Director Defendants, Administrative Committee and/or the Compensation Committee would have revealed to a reasonable fiduciary that investment by the Plan in GGP Stock, under these circumstances where General Growth was heavily indebted and likely required bankruptcy protection, was imprudent.

**ANSWER TO NO. 143:**    Defendants deny the allegations contained in this paragraph.

144.    Because Defendants knew or should have known that GGP Stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its Participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in GGP Stock.

**ANSWER TO NO. 144:**    Defendants deny the allegations contained in this paragraph.

145.    Defendants had available to the several different options for satisfying this duty, including: (i) making appropriate public disclosures as necessary; (ii) divesting the Plan of Company Stock; (iii) causing the Plan and its Participants to invest in alternative investments in the Plan instead of in GGP Stock; (iv) consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the Participants of the Plan; or (v) resigning as fiduciaries of the Plan to the extent that as a result of their employment by the Company they could not loyally serve Participants in the Plan in connection with the Plan's acquisition and holding of Company Stock.

**ANSWER TO NO. 145:**    Defendants deny the allegations contained in this paragraph.

146.    Despite the availability of these and other options, Defendants failed to take any action to protect the Plan or its Participants from lost profits or a diminution of vested benefits as a result of the Plan's holding GGP Stock. Instead, GGP Stock remained one of the Plan retirement savings options up until the end of the Class Period when General Growth filed for bankruptcy protection.

**ANSWER TO NO. 146:**    Defendants deny the allegations contained in this paragraph.

## Losses To The Plan And Its Participants

147.     Unaware that Defendants' representations about the Company's debt refinancing were inaccurate, the Plan's Participants invested substantial amounts of their retirement savings in GGP Stock at prices that were artificially inflated.

**ANSWER TO NO. 147:**   Defendants deny the allegations contained in this paragraph.

148.     When investors (including plan Participants) began to learn the truth about the debt financing problems at General Growth, the Company's Stock price plummeted taking with it Participant's vested retirement benefits in the Plan.  Because of Defendants' fiduciary breaches, the vested retirement benefits in the Plan have been significantly diminished and impaired.

**ANSWER TO NO. 148:**   Defendants deny the allegations contained in this paragraph.

## Improper Insider Sales

149.     Several of the Director Defendants and a number of other senior officers of the Company did not share in the Plan's losses, as they apparently realized the imprudence of their investments in GGP Stock and sold their own shares before the stock price plummeted.

**ANSWER TO NO. 149:**   Defendants deny the allegations contained in this paragraph.

150.     Between April 30, 2007, when the Company reported its financial results for the first quarter of 2007, and October 3, 2008, when the Company suspended its stock dividend and Defendant Freibaum resigned and the *Chicago Tribune* published the abovementioned news article reporting that Company stock fell 48% the day prior, a number of the Company insiders completed unusually large stock sales, selling approximately 6 million shares of personally held, GGP Stock at inflated prices for more than $124 million in proceeds. For example:

| Name/Position | Date(s) of Sale(s) | Number of Shares Sold | Sale Price Per Share | Proceeds |
|---|---|---|---|---|
| **Defendant Freibaum** | 9/19/08 | 1.500.000 | $20.75 | $31.128.924 |
| | 9/25/08 | 1,681,455 | $16.86 | $28,344,038 |
| **Defendant Michaels** | 12/18/07 | 11,267 | $42.10-$42.47 | $476,000 |
| | 12/18/07 | 14,598 | $41.55-$42.08 | $610,000 |
| | 12/18/07 | 25,002 | $41.21-$41.51 | $1,034,000 |
| | 12/18/07 | 45,500 | $40.93-$41.21 | $1,869,000 |
| | 12/18/07 | 35,100 | $40.71-$40.92 | $1,433,000 |
| | 12/18/07 | 30,300 | $40.44-$40.70 | $1,229,000 |
| | 12/18/07 | 26,900 | $40.15-$40.43 | $1,084,000 |
| | 8/7/08 | 700,000 | $27.13 | $18,993,310 |
| | 9/19/08 | 300,000 | $22.04 | $6,613,479 |
| | 9/25/08 | 200,000 | $15.79 | $3,157,917 |

| Name/Position | Date(s) of Sale(s) | Number of Shares Sold | Sale Price Per Share | Proceeds |
|---|---|---|---|---|
| **Defendant Schlemmer** | 12/19/07<br>8/11/08<br>9/19/08<br>9/25/08 | 75,000<br>50,000<br>50,000<br>60,000 | $41.15-$41.45<br>$27.29<br>$21.67<br>$17.35 | $3,098,000<br>$1,364,500<br>$1,083,745<br>$1,040,886 |
| **Joel Bayer**<br>Senior Vice President and Chief Investment Officer since 2001, and Senior Vice President, Acquisitions from 1998 to 2001 | 9/19/08<br>9/25/08 | 500,000<br>400,000 | $20.43<br>$16.61 | $10,217,050<br>$6,645,937 |
| **Alexander L. Berman**<br>Senior Vice President, GGP International since 2005 | 9/24/08 | 15,000 | $16.50 | $247,500 |
| **Anthony Downs**<br>Director since 1993 | 9/19/08 | 15,000 | $24.00 | $360,000 |
| **Ronald L. Gern**<br>Senior Vice President, Assistant Secretary, and General Counsel since December 1997 | 9/19/08<br>9/26/08 | 35,000<br>15,000 | $20.29<br>$16.09 | $710,058<br>$241,352 |
| **Edmund G. Hoyt**<br>Senior Vice President, Chief Accounting Officer since 2000 | 9/24/08<br>9/26/08 | 80,000<br>30,000 | $16.44<br>$15.74 | $1,315,200<br>$472,200 |
| **Sharon Polonia**<br>Senior Vice President, Asset Management since 2000 | 9/19/08 | 28,758 | $16.64 | $478,576 |
| **Beth Stewart**<br>Director since 1993 | 3/18/08<br>6/30/08<br>9/19/08 | 10,000<br>8,000<br>4,500 | $34.07-$34.15<br>$35.04<br>$20.40 | $341,000<br>$280,288<br>$91,820 |

| Name/Position | Date(s) of Sale(s) | Number of Shares Sold | Sale Price Per Share | Proceeds |
|---|---|---|---|---|
| **Robert Wyant** Senior Vice President, Development since January 2008, Senior Vice President, Asset Management from 2000 to December 2007 | 5/2/08 5/16/08 | 3,300 2,000 | $43.12 $43.67 | $142,298 $87,340 |
| **Total:** | | **5,951,680** | | **$124,190,418** |

**ANSWER TO NO. 150:**   To the extent this paragraph relates to the alleged conduct of persons other than the Defendants, an answer is neither necessary nor appropriate.  As to the stock sales of Defendant Michaels and Defendant Schlemmer, Defendants Michaels and Schlemmer refer to the SEC Forms 4 reflecting the details of their transactions.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

151.    At the same time that certain Defendants (and officers of the Company) were selling nearly 6 million shares of their personally held GGP Stock, the Plan's fiduciaries continued to cause the Plan to hold, and the Plan's Participants to acquire additional GGP Stock, failing to conduct a reasonable investigation into these suspicious insider sales and the prudence of the Plan's continued investment in GGP Stock.

**ANSWER TO NO. 151:**   Defendants deny the allegations contained in this paragraph.

152.    While several of the Defendants and the Company's officers took affirmative steps to preserve their investments in GGP Stock, Defendants failed to take any action to prevent the Plan and its Participants from incurring massive losses on their investments.

**ANSWER TO NO. 152:**   Defendants deny the allegations contained in this paragraph.

## CAUSES OF ACTION

153.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

**ANSWER TO NO. 153:**    To the extent this paragraph sets forth legal conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants refer to ERISA § 502(a)(2) and § 409, and the applicable case law, for their true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

154.    At all relevant times, Defendants were, and acted as, fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

**ANSWER TO NO. 154:**    To the extent the allegations in this paragraph set forth legal conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants state that fiduciaries only had the authority and responsibility with respect to the Plan as set forth in the applicable Plan documents and other related materials (*i.e.*, 1/1/06 GGPLP written consent and committee charters), and that the scope of any fiduciary duty is set forth in ERISA and the applicable case law.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

155.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any diminution of vested benefits to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

Answer to No. 155:    To the extent this paragraph sets forth legal conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants refer to

ERISA § 409(a), and the applicable case law, for its true meaning and effect.  Except as

expressly admitted herein, the allegations contained in this paragraph are denied.

156.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the Participants and beneficiaries, for the exclusive purpose of providing benefits to Participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are the "highest known to the law."

**ANSWER TO NO. 156:**    To the extent this paragraph sets forth legal conclusions, an

answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants

refer to ERISA § 404(a)(1)(A) and (B), and the applicable case law, for its true meaning and

effect.  Except as expressly admitted herein, the allegations contained in this paragraph are

denied.

157.    A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents. A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

**ANSWER TO NO. 157:**    To the extent this paragraph sets forth legal conclusions, an

answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants

refer to ERISA, and the applicable case law, which sets forth the scope and nature of a

fiduciary's duties and responsibilities.  Except as expressly admitted herein, the allegations

contained in this paragraph are denied.

158.    Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of Defendants' breaches of their fiduciary duties.

Answer to No. 158:    Defendants admit that Plaintiffs seek to bring this action under

ERISA § 502(a)(2) for plan-wide relief under ERISA § 409(a) to recover alleged losses

sustained by the Plan.  Except as expressly admitted herein, the allegations contained in this

paragraph are denied.

## COUNT I

### Breach of Fiduciary Duty to Manage the Plan's Assets Prudently
### (<u>Against All Defendants</u>)

159.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

**ANSWER TO NO. 159:**    Defendants incorporate by reference their answers to

paragraphs 1 through 158.

160.    As alleged above, Defendants were responsible, in different ways and to differing extents, for the selection, maintenance, and monitoring of the Plan's investment options, including the option to purchase and hold investments in GGP Stock. Defendants had the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of the Plan to ensure that each investment was a suitable option for the Plan.

**ANSWER TO NO. 160:**    To the extent this paragraph sets forth legal conclusions, an

answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants

state that they only had the authority and responsibility with respect to the Plan as set forth in the

applicable Plan documents and other related materials (*i.e.*, 1/1/06 GGPLP written consent and

committee charters), and that the scope of any fiduciary duty is set forth in ERISA and the

applicable case law.  Except as expressly admitted herein, the allegations contained in this

paragraph are denied.

161.    Defendants exercised discretionary authority and/or control over management of the Plan and disposition of the Plan's assets and were therefore responsible for ensuring that investment options made available to Participants were prudent. Furthermore, Defendants were responsible for ensuring that assets within the Plan are prudently invested and that all investments in GGP Stock in the Plan were prudent and consistent with the purpose of the Plan.

**ANSWER TO NO. 161:**    To the extent this paragraph sets forth legal conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants state that they only had the authority and responsibility with respect to the Plan as set forth in the applicable Plan documents and other related materials (*i.e.*, 1/1/06 GGPLP written consent and committee charters), and that the scope of any fiduciary duty is set forth in ERISA and the applicable case law.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

162.    Defendants knew or should have known that, throughout the Class Period, General Growth had accumulated billions of dollars in debt and would be unlikely to secure the necessary financing to satisfy those debts. Defendants further knew or should have known that General Growth's failure to disclose its financial and refinancing problems artificially inflated the value of GGP Stock.

**ANSWER TO NO. 162:**    Defendants deny the allegations contained in this paragraph.

163.    Specifically, at least some of the Defendants had actual knowledge of General Growth's corporate malfeasance and questionable reporting and business. In addition, in light of their positions as high ranking officers at the Company, Defendants had/should have had constructive knowledge of these activities.

**ANSWER TO NO. 163:**    Defendants deny the allegations contained in this paragraph.

164.    Based upon the size and number of sales of GGP Stock by insiders, including Defendants Michaels and Freibaum, the Plan's fiduciaries should have recognized the imprudence of Participants continuing their investments in GGP Stock.

**ANSWER TO NO. 164:**    Defendants deny the allegations contained in this paragraph.

165.    Participants, in contrast, invested in GGP Stock relying on the Company's financial misstatements and omissions and Defendants' continued offering of GGP Stock as an investment option under the Plan.

**ANSWER TO NO. 165:**   Defendants deny the allegations contained in this paragraph.

166.   Defendants breached their duties to prudently and loyally manage the assets of the Plan. During the Class Period, upon the exercise of reasonable care, Defendants should reasonably have known that investment in GGP Stock was imprudent in that any such investment was unsuitable and inappropriate for either Participant contributions or company matching contributions to the Plan. During the Class Period, Defendants, in violation of their fiduciary duties, continued to offer GGP Stock as an investment option for the Plan and to direct and approve the Plan's investment in GGP Stock, instead of other investments as permitted by the Plan. Despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to prevent the Plan, and indirectly the Plan's Participants and beneficiaries, from suffering substantial losses as a result of the Plan's investment in GGP Stock.

**ANSWER TO NO. 166:**   Defendants deny the allegations contained in this paragraph.

167.   Defendants also breached their duty of loyalty by failing to administer the Plan with single-minded devotion to the interests of Plaintiffs and the other members of the Class, regardless of Defendants' own interests.

**ANSWER TO NO. 167:**   Defendants deny the allegations contained in this paragraph.

168.   Defendants also breached their fiduciary duties by failing to disclose that they had failed prudently and loyally to manage the assets of the Plan in the exercise of their discretion with respect to GGP Stock as an investment option in the Plan.

**ANSWER TO NO. 168:**   Defendants deny the allegations contained in this paragraph.

169.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other Participants, lost a significant portion of their investments meant to help Participants save for retirement Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**ANSWER TO NO. 169:**   Defendants deny the allegations contained in this paragraph.

## COUNT II

### Breach of Fiduciary Duty to Provide Complete and
### Accurate Information to the Plan's Participants
### (<u>Against the Communications Defendants as Defined Below</u>)

170.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

**ANSWER TO NO. 170:**    Count II was dismissed with prejudice pursuant to the Court's

May 6, 2010 Memorandum Opinion and Order.  Accordingly, an answer is not necessary to this

paragraph.

171.    This Count alleges fiduciary breach against the Director Defendants and the Administrative Committee Defendants (collectively, the "Communications Defendants").

**ANSWER TO NO. 171:**    Count II was dismissed with prejudice pursuant to the Court's

May 6, 2010 Memorandum Opinion and Order.  Accordingly, an answer is not necessary to this

paragraph.

172.    The Communications Defendants owed Participants a fiduciary duty not to misinform or mislead them regarding the Plan or the Plan's investment options, but rather to speak truthfully and refrain from providing inaccurate material information.

**ANSWER TO NO. 172:**    Count II was dismissed with prejudice pursuant to the Court's

May 6, 2010 Memorandum Opinion and Order.  Accordingly, an answer is not necessary to this

paragraph.

173.    The Communications Defendants were required to disclose complete and accurate information regarding the Plan and the Plan's investment options such that Participants can make informed decisions regarding how to exercise their rights and interests under the Plan. This included disseminating the Plan documents and information to Participants regarding the Plan and assets of the Plan. The Communications Defendants additionally owed Participants a fiduciary duty to affirmatively provide Participants with investment education and with any information they possessed that they knew or should have known would have a material impact on the Plan.

**ANSWER TO NO. 173:**   Count II was dismissed with prejudice pursuant to the Court's May 6, 2010 Memorandum Opinion and Order.  Accordingly, an answer is not necessary to this paragraph.

174.    These duties recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the Communications Defendants, on the one hand, and the Participants, on the other. These duties applied to all of the Plan's investment options, including investment in GGP Stock.

**ANSWER TO NO. 174:**   Count II was dismissed with prejudice pursuant to the Court's May 6, 2010 Memorandum Opinion and Order.  Accordingly, an answer is not necessary to this paragraph.

175.    The Communications Defendants breached these duties by failing to provide complete and accurate information regarding General Growth and the prudence of GGP Stock as an retirement savings option under the Plan, making material misrepresentations about the Company's financial condition, and, generally, by conveying inaccurate information regarding the soundness of Company Stock and the prudence of GGP Stock for retirement savings. The Communications Defendants knew or should have known that information they possessed regarding the Company's operations, financial conditions, debt obligations, and access to financing would have an extreme impact on the Plan.  Yet, in violation of their fiduciary duties, the Communications Defendants failed to provide Participants with this information that was crucial to accurately assess the quality of GGP Stock as a retirement asset.

**ANSWER TO NO. 175:**   Count II was dismissed with prejudice pursuant to the Court's May 6, 2010 Memorandum Opinion and Order.  Accordingly, an answer is not necessary to this paragraph.

176.    The Communications Defendants permitted the issuance of a multitude of inaccurate statements through SEC filings and press releases regarding the value of GGP Stock and the financial health of the Company.

**ANSWER TO NO. 176:**   Count II was dismissed with prejudice pursuant to the Court's May 6, 2010 Memorandum Opinion and Order.  Accordingly, an answer is not necessary to this paragraph.

177.    Such communications were disseminated directly to all Participants, which incorporated by reference the Company's inaccurate SEC filings and reports furnished by General Growth through its officers. In addition, the Company communicated directly with all Participants regarding the merits of investing in GGP Stock in company-wide and uniform communications, and yet in the context of such communications failed to provide complete and accurate information regarding GGP Stock as required by ERISA.  Further, the Company's Forms 10-K, 10-Q, and 8-K were all incorporated into the SPD and are therefore fiduciary communications.

**ANSWER TO NO. 177:**    Count II was dismissed with prejudice pursuant to the Court's

May 6, 2010 Memorandum Opinion and Order.  Accordingly, an answer is not necessary to this

paragraph.


178.    Because the Communications Defendants never disclosed adverse, material information to Participants, at the time that Participants made such investments, Participants were without knowledge of the facts concerning the inaccurate statements and omissions alleged herein which revealed the imprudence of investing in GGP Stock. Participants lacked sufficient information to make informed choices regarding investment of their retirement savings in GGP Stock, or to appreciate that under the circumstances known to the fiduciaries, but not known by Participants, GGP Stock was an inherently unsuitable and inappropriate retirement asset for their Plan accounts.

**ANSWER TO NO. 178:**    Count II was dismissed with prejudice pursuant to the Court's

May 6, 2010 Memorandum Opinion and Order.  Accordingly, an answer is not necessary to this

paragraph.


179.    The Communications Defendants' inaccurate statements and omissions were material to the determination of Plaintiffs and the other members of the Class whether investing in or maintaining their investments in the GGP Stock was prudent. Thus, Participants relied to their detriment on the incomplete and inaccurate information provided by the Communications Defendants in their fiduciary communications.

**ANSWER TO NO. 179:**    Count II was dismissed with prejudice pursuant to the Court's

May 6, 2010 Memorandum Opinion and Order.  Accordingly, an answer is not necessary to this

paragraph.


180.    The Communications Defendants' breaches of fiduciary duty were particularly devastating to the Plan and its Participants, as a significant percentage of the Plan's assets was

invested in GGP Stock during the Class Period. The Plan, and indirectly Plaintiffs and the other Class members, lost tens of millions of dollars of retirement savings as a result of the stock's precipitous decline. Had accurate information been provided, Participants could have avoided these losses.

**ANSWER TO NO. 180:**   Count II was dismissed with prejudice pursuant to the Court's

May 6, 2010 Memorandum Opinion and Order.  Accordingly, an answer is not necessary to this

paragraph.

181.    Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), The Communications Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**ANSWER TO NO. 181:**   Count II was dismissed with prejudice pursuant to the Court's

May 6, 2010 Memorandum Opinion and Order.  Accordingly, an answer is not necessary to this

paragraph.

## COUNT III

### Breach of Fiduciary Duty to Monitor the Plan
### (<u>Against the Monitoring Defendants as Defined Below</u>)

182.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

**ANSWER TO NO. 182:**   Count III was dismissed with prejudice as against all

Defendants except Defendant Bucksbaum (and Defendant Freibaum, who is represented

separately) pursuant to the Court's May 6, 2010 Memorandum Opinion and Order.  Accordingly,

an answer is not necessary to this paragraph, except by Defendant Bucksbaum.  Defendant

Bucksbaum incorporates by reference his answers to paragraphs 1 through 181.

183.    This Count alleges fiduciary breach against the Director Defendants and the Investment Committee Defendants (collectively, the "Monitoring Defendants").

**ANSWER TO NO. 183:**   Count III was dismissed with prejudice as against all

Defendants except Defendant Bucksbaum pursuant to the Court's May 6, 2010 Memorandum

Opinion and Order.  Accordingly, an answer is not necessary to this paragraph, except by

Defendant Bucksbaum.  Defendant Bucksbaum admits that in Count III Plaintiffs were alleging

fiduciary breach against the Director Defendants and the Investment Committee Defendants,

whom Plaintiffs refer to in their Consolidated Complaint as the "Monitoring Defendants."


184.    At all relevant times, as alleged above, the scope of the fiduciary responsibilities
of the Monitoring Defendants included the responsibility to appoint, evaluate, and monitor other
fiduciaries. The duty to monitor entails both giving information to and reviewing the actions of
the monitored fiduciaries.

**ANSWER TO NO. 184:**   Count III was dismissed with prejudice pursuant as against all

Defendants except Defendant Bucksbaum to the Court's May 6, 2010 Memorandum Opinion and

Order.  Accordingly, an answer is not necessary to this paragraph, except by Defendant

Bucksbaum.  To the extent that allegations in this paragraph set forth legal conclusions, an

answer by Defendant Bucksbaum is neither necessary nor appropriate.  To the extent an answer

is required, Defendant Bucksbaum states that he only had the authority and responsibility with

respect to the Plan as set forth in the applicable Plan documents and other related materials (i.e.,

1/06 GGPLP written consent and committee charters), and that the scope of any fiduciary duty is

set forth in ERISA and the applicable case law.  Except as expressly admitted herein, the

allegations contained in this paragraph are denied.


185.    The Monitoring Defendants had the duty to ensure that the appointed
fiduciaries:

    (a)    were performing their fiduciary obligations, including those with respect
           to the investment of Plan assets;

    (b)    possessed the needed credentials and experience, were knowledgeable
           about the operations of the Plan, the goals of the Plan, as noted above,

and the behavior of the Plan's Participants, and used qualified advisors and service providers when necessary to fulfill their duties;

(c)     were provided with adequate financial resources to do their job;

(d)     had complete and accurate information necessary to prudently manage the Plan and the Plan assets;

(e)     had ready access to outside, impartial advisors when needed;

(f)     maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investment options; and

(g)     reported regularly to the Company, so that the Company could then review, understand, and approve their conduct.

**ANSWER TO NO. 185:**   Count III was dismissed with prejudice as against all Defendants except Defendant Bucksbaum pursuant to the Court's May 6, 2010 Memorandum Opinion and Order.  Accordingly, an answer is not necessary to this paragraph, except by Defendant Bucksbaum.  To the extent that allegations in this paragraph set forth legal conclusions, an answer by Defendant Bucksbaum is neither necessary nor appropriate.  To the extent an answer is required, Defendant Bucksbaum states that he only had the authority and responsibility with respect to the Plan as set forth in the applicable Plan documents and other related materials (i.e., 1/06 GGPLP written consent and committee charters), and that the scope of any fiduciary duty is set forth in ERISA and the applicable case law.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

186.   The Monitoring Defendants breached their fiduciary monitoring duties by, *inter alia*:

(a)     failing to ensure that the monitored fiduciaries had adequate information about the Company's debt obligations and ability to obtain the necessary financing, which made Company Stock an imprudent investment;

(b)    failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment by rank and file employees in an undiversified employer stock fund which was made up primarily of Company Stock, an investment that was imprudent and inherently subject to significant downward movements, especially here where the Company Stock was artificially inflated by non-public corporate malfeasance and illicit activities; and

(c)    allowing the monitored fiduciaries to continue offering GGP Stock as an investment alternative for the Plan and investing the assets of the Plan in GGP Stock when it was no longer prudent to do so.

**ANSWER TO NO. 186:**   Count III was dismissed with prejudice as against all

Defendants except Defendant Bucksbaum pursuant to the Court's May 6, 2010 Memorandum

Opinion and Order.  Accordingly, an answer is not necessary to this paragraph, except by

Defendant Bucksbaum.  Defendant Bucksbaum denies the allegations contained in this

paragraph.

187.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the other Participants, lost a significant portion of their investments meant to help Participants save for retirement.

**ANSWER TO NO. 187:**   Count III was dismissed with prejudice as against all

Defendants except Defendant Bucksbaum pursuant to the Court's May 6, 2010 Memorandum

Opinion and Order.  Accordingly, an answer is not necessary to this paragraph, except by

Defendant Bucksbaum.  Defendant Bucksbaum denies the allegations contained in this

paragraph.

188.   Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C., § 1109(a), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**ANSWER TO NO. 188:**   Count III was dismissed with prejudice as against all

Defendants except Defendant Bucksbaum pursuant to the Court's May 6, 2010 Memorandum

Opinion and Order.  Accordingly, an answer is not necessary to this paragraph, except by

Defendant Bucksbaum.  Defendant Bucksbaum denies the allegations contained in this

paragraph.

## COUNT IV

### Breach of Fiduciary Duty of Loyalty
### (<u>Against All Defendants</u>)

189.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this
Complaint as if fully set forth herein.

**ANSWER TO NO. 189:**    Defendants incorporate by reference their answers to

Paragraphs 1 through 188.


190.    Defendants owed Participants a fiduciary duty of loyalty, that is, a duty to act
with undivided loyalties to the Plan and single-minded devotion to the interests of the
Participants, regardless of the interests of the fiduciaries themselves or the plan sponsor.
Defendants were also required to avoid conflicts of interest and to resolve them promptly when
they occurred.

**ANSWER TO NO. 190:**    To the extent this paragraph sets forth legal conclusions, an

answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants

state that each only had the authority and responsibility with respect to the Plan as set forth in the

applicable Plan documents and other related materials (i.e., 1/06 GGPLP written consent and

committee charters), and that the scope of any fiduciary duty is set forth in ERISA and the

applicable case law.  Except as expressly admitted herein, the allegations contained in this

paragraph are denied.


191.    Given the allegations listed above, Defendants clearly placed the interests of
themselves and the Company, as evidenced by the longstanding artificial inflation of Company
Stock, before the interests of the Plan and its Participants. These conflicts of interest put
Defendants in the inherently problematic position of having to choose between their own
interests as directors, officers, executives, and GGP stockholders, and the interests of the Plan's

Participants and beneficiaries, in whose interests Defendants were obligated to loyally serve with an "eye single."

**ANSWER TO NO. 191:**   Defendants deny the allegations contained in this paragraph.

192.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia:* (a) failing to engage independent fiduciaries who could make independent judgments concerning the Plan's holdings in GGP Stock; (b) failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transactions that made GGP Stock an unsuitable investment for the Plan; (c) failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; (d) with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and (e) by otherwise placing the interests of the Company and themselves above the interests of the Participants with respect to the Plan's investment in Company Stock.

**ANSWER TO NO. 192:**   Defendants deny the allegations contained in this paragraph.

193.    Certain fiduciaries sold their personally held GGP Stock at artificially inflated prices and personally profited while the Plan and its Participants suffered massive losses.

**ANSWER TO NO. 193:**   Defendants deny the allegations contained in this paragraph.

194.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**ANSWER TO NO. 194:**   Defendants deny the allegations contained in this paragraph.

**COUNT V**
**Co-Fiduciary Liability**
**(<u>Against All Defendants</u>)**

195.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

**ANSWER TO NO. 195:**   Defendants incorporate by reference their answers to

Paragraphs 1 through 194.

196.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other
>
> fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

**ANSWER TO NO. 196:**    To the extent this paragraph sets forth legal conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants refer to ERISA § 502(a)(2) and § 409, and the applicable case law, for their true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

197.    Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches, as alleged above, as well as those by the appointed Plan fiduciaries; they enabled the breaches by these Defendants; and they failed to make any effort to remedy these breaches, despite having knowledge of them.

**ANSWER TO NO. 197:**    Defendants deny the allegations contained in this paragraph.

198.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and other Participants, lost a significant portion of their retirement investment.

**ANSWER TO NO. 198:**    Defendants deny the allegations contained in this paragraph.

199.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**ANSWER TO NO. 199:**   Defendants deny the allegations contained in this paragraph.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

200.    Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in GGP Stock during the Class Period. As a consequence of Defendants' breaches, the Plan suffered significant losses.

**ANSWER TO NO. 200:**   Defendants deny the allegations contained in this paragraph.

201.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . duties imposed upon fiduciaries ... to make good to such plan any losses to the plan . . . ." Section 409 also authorizes such other equitable or remedial relief as the court may deem appropriate ...."

**ANSWER TO NO. 201:**   To the extent this paragraph sets forth legal conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants refer to ERISA § 502(a)(2) and § 409, and the applicable case law, for their true meaning and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

202.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Participants and beneficiaries in the Plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

**ANSWER TO NO. 202:**   To the extent this paragraph sets forth legal conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants refer to the remedies provisions in ERISA, and the applicable case law, for their true meaning

and effect.  Except as expressly admitted herein, the allegations contained in this paragraph are

denied.

203.    Plaintiffs and the Class are therefore entitled to relief from Defendants in the
form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan
resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial
based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C.
§ 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches
alleged above, as provided by ERISA §§ 409(a) and 502(a)(2)-(3), 29 U.S.C. §§ 1109(a) and
1132(a)(2)-(3); (c) reasonable attorney fees and expenses, as provided by ERISA § 502(g),
29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d) taxable costs;
(e) interest on these amounts, as provided by law; and (f) such other legal or equitable relief
as may be just and proper.

**ANSWER TO NO. 203:**   Defendants deny that Plaintiffs are entitled to the requested

relief, or any other relief.

204.    Under ERISA, each Defendant is jointly and severally liable for the losses
suffered by the Plan in this case.

**ANSWER TO NO. 204:**   Defendants deny the allegations contained in this paragraph.

## CLASS ACTION ALLEGATIONS

205.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal
Rules of Civil Procedure on behalf of themselves and the following class of persons similarly
situated (the "Class"):

> All persons who were Participants in or beneficiaries of the Plan at
> any time between April 30, 2007 and April 16, 2009 and whose
> accounts held Company stock or units in Company Stock during
> that time.

**ANSWER TO NO. 205:**   Defendants admit that Plaintiffs seek to bring this action as a

class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and that they seek to

represent a proposed class as defined in this paragraph.  Except as expressly admitted herein, the

allegations contained in this paragraph are denied.

206.    The members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery.

**ANSWER TO NO. 206:**    To the extent the allegations in this paragraph set forth legal conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants admit that Plaintiffs assert they may ascertain the exact number of putative class members through appropriate discovery.  Except as expressly admitted herein, the allegations contained in this paragraph are denied.

207.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

> (a)    whether Defendants each owed a fiduciary duty to Plaintiffs and the other members of the Class;

> (b)    whether Defendants breached their fiduciary duties to Plaintiffs and the other members of the Class by failing to act prudently and solely in the interests of the Plan's Participants and beneficiaries;

> (c)    whether Defendants violated ERISA; and

> (d)    whether Plaintiffs and the other members of the Class have sustained damages and, if so, what is the appropriate measure thereof.

**ANSWER TO NO. 207:**    To the extent the allegations in this paragraph set forth legal conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants deny the allegations in this paragraph.

208.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and the other members of the Class each sustained a diminution of vested benefits arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

**ANSWER TO NO. 208:**   To the extent the allegations in this paragraph set forth legal

conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required,

Defendants deny the allegations in this paragraph.


209.   Plaintiffs will fairly and adequately protect the interests of the members of the
Class and have retained counsel competent and experienced in class action, ERISA, and complex
civil and commercial litigation. Plaintiffs have no interests antagonistic to or in conflict with
those of the Class.

**ANSWER TO NO. 209:**   To the extent the allegations in this paragraph set forth legal

conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required,

Defendants deny the allegations in this paragraph.


210.   Class action status in this ERISA action is warranted under Rule 23(b)(1)(A)
because prosecuting separate actions by the members of the Class would create a risk of
establishing incompatible standards of conduct for Defendants.

**ANSWER TO NO. 210:**   To the extent the allegations in this paragraph set forth legal

conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required,

Defendants deny the allegations in this paragraph.


211.   Class action status in this ERISA action is also warranted under Rule
23(b)(1)(B) because prosecution of separate actions by the members of the Class would create
a risk of adjudications with respect to individual members of the Class which would, as a
practical manner, be dispositive of the interests of the other members of the Class or
substantially impair or impede their ability to protect their interests.

**ANSWER TO NO. 211:**   To the extent the allegations in this paragraph set forth legal

conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required,

Defendants deny the allegations in this paragraph.


212.   Class action status is additionally warranted under Rule 23(b)(2) because
Defendants have acted or refused to act on grounds generally applicable to the Class, thereby
making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect
to the Class as a whole.

**ANSWER TO NO. 212:**   To the extent the allegations in this paragraph set forth legal conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants deny the allegations in this paragraph.

213.   Class action status is further warranted under Rule 23(b)(3) because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

**ANSWER TO NO. 213:**   To the extent the allegations in this paragraph set forth legal conclusions, an answer is neither necessary nor appropriate.  To the extent an answer is required, Defendants deny the allegations in this paragraph.

## PRAYER FOR RELIEF

Defendants deny that Plaintiffs are entitled to the requested relief, or any other relief.

## AFFIRMATIVE DEFENSES

Defendants make the following affirmative and other defenses to Plaintiffs' Consolidated Complaint:

1.   The claims of any Plaintiff or putative class member who signed a general release of claims as part of their Separation Agreement are barred by waiver and other applicable doctrines.

2.   Plaintiffs' claims are barred, in whole or in part, by application of ERISA § 404(c), 29 U.S.C. § 1104(c).

3.   Defendants cannot be held liable for breach of fiduciary duty to the extent each Defendant is not a fiduciary for purposes of the "duties" allegedly breached, the acts or omissions that form the basis of Plaintiffs' claims were not fiduciary acts, or the Plan allocated those duties to other persons or entities.

4.      Plaintiffs' claims fail, in whole or in part, to the extent Plaintiffs challenge discretionary decisions made by Defendants, because there was no abuse of that discretion.

5.      Plaintiffs are not entitled to the relief sought under ERISA § 502(a)(2) and (a)(3). Specifically, the relief Plaintiffs seek against Defendants is beyond the equitable remedies authorized by those provisions.

6.      Plaintiffs' claims are subject to the automatic bankruptcy stay arising from GGP's bankruptcy to the extent any equitable relief sought by Plaintiffs would invade the province of the bankruptcy court.

7.      To the extent Plaintiffs are seeking relief under ERISA § 502(a)(1)(B), Plaintiffs have failed to exhaust their administrative remedies.

8.      Plaintiffs lack standing to bring their claims under ERISA to the extent any Plaintiff does not meet the statutory requirements.

9.      To the extent Plaintiffs are seeking to recover investment losses, Plaintiffs cannot show a causal connection between such claims and their alleged losses, and any such losses would be purely speculative.

10.     Plaintiffs suffered no injury as a result of the Defendants' alleged breaches of fiduciary duty.

11.     Plaintiffs have failed to state claims upon which relief can be granted.

WHEREFORE, Defendants respectfully request that this Court enter judgment in their favor and against Plaintiffs, award Defendants their costs and attorneys fees incurred in the defense of this action pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and grant Defendants such other relief as this Court deems appropriate.

Respectfully submitted,

JOHN BUCKSBAUM, ROBERT A. MICHAELS, JUDY HERBST, CHARLES LHOTKA, MICHELLE R. McGOVERN, HEATHER MARGULIS, JEAN SCHLEMMER AND KATE SHEEHY

By:     */s/ Craig C. Martin*

Anton R. Valukas (Illinois Bar #2883678)
Craig C. Martin (Illinois Bar #6201581)
Dean N. Panos (Illinois Bar #6203600)
Daniel J. Winters (Illinois Bar #6194036)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL  60654-3456
Telephone: 312 222-9350
Facsimile: 312 527-0484

*Attorneys for Defendants John Bucksbaum, Robert A. Michaels, Judy Herbst, Charles Lhotka, Michelle R. McGovern, Heather Margulis, Jean Schlemmer, and Kate Sheehy*

Dated:  May 20, 2010

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 20, 2010, I caused a true and correct copy of the foregoing **Certain Defendants' Answer and Affirmative Defenses to Plaintiffs' Consolidated Class Action Complaint For Violations Of The Employee Retirement Income Security Act** to be served on counsel of record via electronic filing through the Court's ECF system.

*/s/ Craig C. Martin*
Craig C. Martin

Document No. 1864800